[No. G023433. Fourth Dist., Div. Three. Feb. 25, 2000.]

THE PEOPLE, Plaintiff and Respondent, v.
JEEN YOUNG HAN et al., Defendants and Appellants.

### COUNSEL

Ronald D. MacGregor and Stephen Gilbert, under appointments by the Court of Appeal, for Defendant and Appellant Jeen Young Han.

Cynthia M. Sorman, under appointment by the Court of Appeal, for Defendant and Appellant Archie Bryant.

Bill Lockyer, Attorney General, David P. Druliner, Chief Assistant Attorney General, Gary W. Schons, Assistant Attorney General, Keith I. Motley and Warren P. Robinson, Deputy Attorneys General, for Plaintiff and Respondent.

### OPINION

**CROSBY, J.**—Jeen Young Han, Archie Bryant, and John Sayarath were convicted of conspiracy to murder Jeen Han's twin sister, Sunny Han, and other related crimes.[1] In this appeal both Jeen and Bryant attack the sufficiency of the evidence and claim error in the refusal to allow discovery of Sunny's medical records. Separately they raise other points. Only one issue has merit; the court erred in running burglary and false imprisonment counts concurrently instead of staying sentence as to the latter offense.[2] Accordingly, we modify the judgments, but otherwise affirm.

I

■   To avoid repetition we combine the recitation of the facts with an analysis of their sufficiency to support the conviction for conspiracy to murder. On November 6, 1996, Sunny lived in an Irvine apartment with Angie Woo, Helen Kim, and Shelly Hur. In the early afternoon, an Asian male, later identified as Sayarath, knocked on the door twice in a half-hour period and asked Woo whether she wanted to buy magazines. She declined and left for school soon after.

About 3:20 p.m., Bryant knocked and Kim answered. He was purportedly selling magazines, but she declined and began to close the door. Bryant, brandishing a gun, and Sayarath barged inside and pushed Kim to the floor. They tied her hands behind her back and duct-taped her mouth.

---

[1]For ease of understanding, we will refer to the sisters by their first names. Both young men were juveniles at the time of the crimes. Jeen was a convicted felon who had failed to return from a San Diego work furlough arrangement about 10 days before.

[2]Only Bryant makes this argument directly, but it applies equally to Jeen, who joins in his contentions.

Meanwhile, Sunny had just left the shower and heard the commotion, including Kim's voice pleading, "Please don't hurt me, take anything you want." A man replied, "Shut up." Sunny locked herself in the bathroom and called 911 on her cellular phone. She reported a burglary in progress and the rape of her roommate.

Bryant somehow entered the bathroom. He pointed the gun at Sunny and accused her of calling the police, but she said she had only called a friend. He grabbed the phone and threw her to the bedroom floor. Like Kim, she said to take what he wanted, but not hurt her. Bryant told her to keep quiet or he would kill her (or shoot her numerous times).

Meanwhile, Kim untied herself and made an attempt to decamp. One of the intruders caught her at the door, though, and she was bound up again. Bryant said, "I could shoot you for that."

Sunny was then trussed up, and Kim was brought into the bedroom. Both women were then moved into the bathroom and made to sit in the bathtub. They heard sounds like someone going through a purse, and Sunny later discovered her purse had been ransacked and some money and two pagers were missing.

Shortly, someone loudly announced, "police"; and Bryant returned to the bathroom and began to untie the victims with great alacrity. Shaking with fright, he told them to tell the police the whole thing was a joke. Before that self-serving instruction, neither of the youths ever offered a reason for the intrusion: They never said the goal was to retrieve Jeen's property, nor did they suggest robbery or murder was the intention. Freed, the women walked outside.

This was the view from the law enforcement perspective: Irvine Police Officer Gregory McFarland arrived at about the same time as Officer Rich Bartalo. As they approached the victims' apartment, Bartalo pointed out an automobile parked in the carport. McFarland contacted the people in the car, while Bartalo continued toward the apartment. Jeen was in the driver's seat, Sayarath in the passenger seat. She claimed she lived there and had been in a fight with one of her roommates about 15 minutes before. In response to the officer's questions, she kept asking, "Is there a problem[?]" He thought, but was not sure, that she gave her name as "Sarin" (Sunny?).

Bartalo reported that someone had stepped outside and then ducked back in the apartment. McFarland turned to Jeen, "and she seemed to be excited[], very nervous, excited, concerned," more so than before. He then left to cover the rear of the apartment.

Officer Eric Wiseman also responded to the dispatcher's call and after speaking briefly with McFarland, joined Bartalo and investigator Victor Ray at the front door of the apartment. Wiseman saw Bryant look out the front door and then turn and run to the rear of the apartment. A few minutes later, Sunny and Kim walked out, followed by Bryant. Wiseman described the condition of the victims: "[O]ne of them was crying, both of them appeared to be kind of in a disheveled state. Their hair was ratted. One of them had duct tape in her hair and she was trying to pull the duct tape out of her hair as she was coming out of the apartment. Both were obviously upset."

Although Bryant was put to the ground at gunpoint, he got up and said, "What are you going to do if I run, are you going to shoot me?" Apparently not. He ran back inside the apartment, closed the door, and reemerged about three minutes later.

This time the officers controlled Bryant and cuffed him. Meanwhile, according to Wiseman, Jeen came up "screaming and yelling and asking . . . what is wrong with her sister, is everything okay in the apartment, asking me all that kind of stuff . . . ." Wiseman, thinking she was the one who had reported the emergency, ordered her to return to her car for safety reasons.[3] She would be contacted later. That was the last the officers saw of Jeen and Sayarath at the scene.

A search of Bryant yielded money, a condom, and a pager, all claimed by Sunny. Kim's sweater provided more duct tape, and nylon twine cord was picked up in the doorway and the bathtub. A loaded derringer handgun, the safety unengaged, was found under some clothes in a laundry basket in Sunny's bedroom the next day. Magazines taken from the apartment bore Sayarath's fingerprints.

Subsequent investigation turned up the following information: A few minutes before the incident began, Jeen unsuccessfully attempted to obtain a key to the apartment from the leasing office. She said she lived there.[4] Earlier that morning Jeen, along with two men, bought gloves, twine, utility tape and several women's magazines at a nearby market. The sales receipt was found in her possession. Another sales slip recovered from Jeen showed the purchase of Pine Sol and garbage bags the previous day.

Less than an hour after the police intervened at the Irvine apartment, someone using Sunny's driver's license as identification withdrew $5,000

---

[3]Wiseman conceded, "I may have said 'get out of here.' "

[4]Presumably she gave Sunny's name when she claimed she was locked out, but neither twin's name was on the lease.

from her bank account in Laguna Beach. Several hours later Jeen, accompanied by a man who was likely Sayarath, completed a credit application at a San Juan Capistrano Nissan dealer to lease or buy an automobile. Jeen showed Sunny's driver's license to the salesman. The paperwork for the transaction could not be completed that night, though, and the pair left.

Jeen and Sayarath were arrested at about half past 10 in the evening by San Diego Police in a car rental office near the airport. In addition to some new gardening gloves and a box of trash bags, police found Jeen had $4,000 in cash, Sunny's driver's license and credit cards, and the store receipts mentioned above. Jeen claimed to be Sunny.

A bullet and a bullet casing were later found in a car returned that night. They were .22-caliber, same as the derringer. The agency employees failed to note which car it was, though.

To this point the evidence is compelling that there was a conspiracy afoot and that Jeen and her teenage accomplices intended to victimize Sunny in some way, at least to steal from her and almost certainly to falsely imprison her as well. Apart from the overt acts and physical evidence, the prosecution relied on the following circumstantial evidence to prove the object of the conspiracy: While sometimes acting as the close companions one would expect of twin sisters, the Hans often fought as well, sometimes yelling, sometimes striking each other. In May of 1996, when Jeen was staying at Sunny's Placentia residence, Sunny struck Jeen with a fist or a telephone. After that, the fourth time over a few months' period the police had been summoned to stop violence between the sisters, Sunny was arrested on a warrant. While she was in jail, Jeen stole her identification, money from her bank accounts, and credit cards.

Sunny pressed charges, and Jeen was arrested. Between the May fight and November 6, the sisters saw each other but once. Jeen refused to endorse a check over to her sister then. Sunny wanted nothing to do with Jeen and refused to bring clothes or her driver's license to her for a jail furlough. She refused to tell her where she was living and hung up on her sister.

A month or so before the November 6 home invasion, Joni Marion drove Darnell Clayton, Lamont Burns, and Jeen from San Diego to Orange County. While she knew Clayton and Burns well, this was the only time she encountered Jeen. During the trip Jeen "started getting mad and then it was—finally it came out she wanted something done to her sister." Jeen was angry because "[s]he wanted it to be done now and we were in no rush and so she started to get mad."

According to Marion, "when [Jeen] started getting mad she stated she wanted her [sister] to be hurt and she started to explain in description what she wanted done to her, but I don't recall exactly what it was. And she told them if they weren't going to do it, she would do it herself." Later she said, "[s]he wanted her dead. She wanted to kill her." Marion related, "when we were leaving to go to Orange County she was starting to yell she wanted her sister dead and she wanted her dead now. If they weren't going to do it, she was going to do it herself." She was offering money to Clayton and Burns to kill Sunny—but Marion could not remember how much—and she wanted to know how to obtain a gun or if they knew how to do so. There was a discussion of preparing a plan, of alibis, but Jeen insisted on searching for Sunny's apartment with a partial address. She wanted her sister killed that night. Only when they could not find her residence did they return to San Diego County.

On the evening of November 5, 1996, Arkisha Moore met Jeen when her cousin, defendant Bryant, brought her to Moore's El Cajon residence. Jeen expressed her desire to replevy some personal property, including a BMW, from her sister and her wish to have her beaten. Moore agreed to help her with the property, but not with hurting Sunny. They recruited Robyn Weatherby to join them for the trip to Orange County. (Weatherby would recall that the trip occurred about a week before the assault on the victims.)

No one was home at Sunny's apartment, but Jeen wanted to wait for her. She said "that if she didn't kill her sister her sister was going to kill her first and just a bunch of other stuff," according to Moore. Jeen said she had bags in the trunk of the car and was going to kill her sister and "clean up the mess and put her in the back room [bathroom?] . . . ." Finally, Moore said, "I would kick her ass if she didn't take me home." On the way back to El Cajon, Jeen inquired if they knew anyone who would kill her sister.

Weatherby recalled that Jeen offered them $80 each to "beat the crap out of my sister; if you can, kill her." Later, when Jeen dropped her off at home, she said, "Do you know anybody that would kill my sister for me or would beat her up for me?" Weatherby said she did not and, in response to a question, said she had never killed anyone herself.

Does this provide substantial evidence that the object of the conspiracy was murder? We think it does. But let us pause to consider the main defense contention at this point. Given, the defense argues, that Jeen might have intended to kill her sister, where is the evidence that her teenage accomplices had that intent? They are not bound by her preagreement statements of intent. And if the evidence is insufficient to show *at least one of the teenage*

*defendants plotted murder with her,* the proof that *any of them, including Jeen,* conspired to kill is insufficient. Jeen could not conspire with herself, and while the evidence might have supported a solicitation for murder, that was not the charge.

The defense concedes that direct evidence of the agreement forming the basis of a conspiracy is not required, that circumstantial evidence will suffice. And here, we think, there was enough. If one solicits bids for tree trimmers, say, and a few days later workers appear with ladders and cutting tools in her orchard, a jury could draw the reasonable inference that an agreement had been formed for the trimming of the trees. Other inferences might also be drawn, but the proof would nonetheless be sufficient for appellate purposes to uphold a finding that an agreement had been formed to trim the trees.

So it is here. The evidence would support the proposition that the object of the conspiracy was to rob or commit some bodily harm to Sunny short of killing her, but that was the jury's call. Jeen's threats against her sister, if believed, were sufficient for appellate purposes to prove her intent to murder (and the intent to injure, steal, or merely replevy her possessions). And her actions were plainly adequate to demonstrate an evil design against her twin: her acquisition of the gloves, plastic bags, Pine Sol, tape, nylon twine, and magazines—and, most of all, her recruitment of the teenage accomplices (with the loaded pistol Bryant wielded with the safety off).

Did the actions of the youths themselves provide circumstantial evidence of a plot to kill? Contrary to the defense argument, we think so. What were they doing attempting to gain access to the apartment posing as magazine salesmen and bursting inside with nylon twine and duct tape while armed with a deadly weapon? Surely they were the ones who accompanied Jeen when these items were purchased.[5] And, very importantly, Bryant was already helping her to some extent on November 5.

While the conspirators did steal some of Sunny's property from her purse, that was arguably an incidental objective. Mainly, in the brief time before the police arrived, they terrorized the victims, tied them up, and placed them *in a bathtub* at gunpoint (where it would be easier to clean up the residue of

---

[5]The Pine Sol and the plastic bags were acquired by Jeen on November 5, perhaps before she met her teenage accomplices.

the killings to come, i.e., "to clean up the mess").[6] As the district attorney argued, Sayarath was likely outside when the police arrived, for the purpose of telling Jeen it was safe to enter (and bring about the demise of her sister). A reasonable trier of fact could certainly find that demonstrated an intent to do more than simply rob the victims.

Jeen knew Sunny would not hesitate to turn her in and would certainly deduce who was behind the home invasion had she merely been imprisoned in her bathroom while they ransacked the apartment. What was Jeen planning to do with the plastic bags and Pine Sol? She had purchased the bags, along with the Pine Sol cleanser a day before she bought the other equipment used in the home invasion. What were they for? Jeen had no home. What was she going to clean, a bloody bathtub, perhaps?

As we said, this evidence was susceptible to various interpretations, but the only problem before us is whether it is susceptible to the one drawn by the jury. It is.

## II

Defendants claim Jeen's expressed desires to arrange her sister's murder were inadmissible because there was no proof that the conspiracy had been formed with her codefendants when they were made.[7] The trial judge correctly told the jury per Evidence Code section 1223 that statements made by an alleged conspirator before proof of the formation of the conspiracy could not be used against other alleged conspirators. (CALJIC No. 6.24.) Thus, the jury was only told that the statements of the men to the victims and Jeen to police at the scene were cross-admissible and those of Jeen before the time of the conspiracy was formed were not.

Given this state of the record, it is entirely possible that the jury did not consider Jeen's pre-November 6 statements against her confederates. But they were clearly admissible against all the defendants per Evidence Code section 1250, under impossible to distinguish Supreme Court authority. Section 1250 provides that evidence of a declarant's then existing state of mind, "including a statement of intent, plan, motive, [or] design," is

---

[6]A defense argument is that the idea was to put Sunny and Kim in a place where they could not see Jeen while she looked for her own things unobserved by her sister. Fine, but this is not a trial de novo.

[7]As noted above, Jeen makes the amazing claim that because conspiracies require more than one member a failure of proof concerning the other conspirators would redound to her benefit as well. We eschew the opportunity to knock down this straw person since, as explained in the text, Jeen's statements were clearly admissible against her *and* her confederates on other grounds.

admissible to prove that state of mind or "to prove or explain acts or conduct of the declarant." The Supreme Court has consistently allowed such evidence to prove the state of mind of the declarant, *as well as the declarant's confederates.*

In the capital murder trial of Ricardo Sanders, a witness was permitted to relate the question of one Carletha Stewart asking if her listeners "wanted to make some money by robbing Bob's Big Boy . . . ." (*People v. Sanders* (1995) 11 Cal.4th 475, 498 [46 Cal.Rptr.2d 751, 905 P.2d 420].) The court's unanimous opinion, not cited in the briefing submitted to us, explains, "Stewart's statement was admissible for the nonhearsay purpose of establishing her state of mind in August 1980, i.e., her intention to form a conspiracy to rob Bob's Big Boy, which was clearly relevant to the issue whether she subsequently entered into a conspiracy with defendant to commit robbery." (*Id.* at p. 518.)

In *People v. Morales* (1989) 48 Cal.3d 527 [257 Cal.Rptr. 64, 770 P.2d 244], the court reached the same result without a dissenting vote on the point. The defense seeks to distinguish *Morales* on the basis that when Ricky Ortega revealed his plan to kill the victim, he expected his cousin, defendant Michael Morales, would help him. After finding the statement inadmissible for purposes of Evidence Code section 1223, the court held it was admissible per Evidence Code section 1250: "Ortega's admitted plan to kill Blythe, his stated assumption or expectation that defendant would help or encourage him in doing so, and his remark that if Winchell were present she would 'get it too,' in the aggregate were probative of the question whether the two men later conspired to kill Winchell." (*Morales, supra,* at p. 552.) The phrase "in the aggregate" cannot be reasonably read to mean Ortega's statement was *only* admissible because it referred to Morales. It was more probative *and prejudicial* for that reason, but the proposed distinction is of no import in light of *Sanders* and the final decision we examine on the point, *People v. Howard* (1988) 44 Cal.3d 375 [243 Cal.Rptr. 842, 749 P.2d 279].

In the *Howard* case, Richard Lemock desired to push the limits of capitalism by arranging the assassination of a business competitor, Walter Berkey. In the capital murder trial of Gary Howard, Lemock's preconspiracy statements were found sufficiently trustworthy to qualify for admission under Evidence Code section 1250 (again, without a dissent on the issue). The only distinguishing feature in *Howard* is this: "The court . . . admonished the jury that the evidence of Lemock's statements was being admitted only for the limited purpose of explaining Lemock's later actions." (*People v. Howard, supra,* 44 Cal.3d at p. 403.)

Defendants were undoubtedly better off here, where the lone instruction the jury had on the subject suggested only postconspiracy formation statements were cross-admissible. If the jury did consider Jeen's pre-November 6

statements to explain her later actions, that was proper. The defense did not request an amplifying instruction on the point per *Howard*, probably as a matter of sound tactics, so the issue was waived in any event. (*People v. Sanders, supra,* 11 Cal.4th at p. 518, fn. 9.)

## III

■ Both defendants complain of the court's refusal to provide them access to Sunny's medical records related to a purported suicide attempt during the trial. After she had testified on direct, and had been cross-examined by Jeen's attorney and partially by Sayarath's attorney, the court recessed. The next day she appeared incompetent to testify and was taken to a hospital. Apparently she attempted suicide with an overdose of sleeping pills. Sunny was hospitalized for a few days before resuming her testimony. At that time she testified she had taken several dozen sleeping pills and ended up in the hospital. Sunny said her actions were not the product of her testimony. She had broken up with her boyfriend, argued with her mother, and was very depressed.

The court did not bother with an in camera inspection before rejecting the defense insistence on access to Sunny's medical records. We find no abuse of discretion. Putting aside doctor-patient privilege issues, the court was well within in the bounds of reason in finding no potential relevance in the records. Sunny was not the central figure in this tragedy, Jeen was. Sunny was not present during Jeen's preparations to do her harm, and the events in the apartment were all witnessed by Helen Kim. Sure, Sunny said Bryant threatened to shoot her numerous times and to kill her, but he said the same thing to Kim. Moreover, Sunny's trial testimony was not materially at variance from her previous statements and preliminary hearing testimony.

Defendants had the opportunity to cross-examine Sunny concerning her purported suicide attempt. They failed to demonstrate why that was not enough with a witness whose testimony was not of great importance in the proof of the charges. Had the police arrived after Sunny had been murdered, but while the defendants were still at the apartment, the case would have been even more easily proved.

## IV

Jeen's final assignment of error attacks the court's refusal to give her modified flight instruction. The court read the standard flight instruction: "The flight of a person immediately after the commission of a crime, or after [he][she] is accused of a crime, is not sufficient in itself to establish

[his][her] guilt, but is a fact which, if proved, may be considered by you in the light of all other proved facts in deciding whether a defendant is guilty or not guilty. The weight to which this circumstance is entitled is a matter for you to decide." (CALJIC No. 2.52.) Jeen wished to add this paragraph: "The defendant's consciousness of guilt, if any, is relevant upon the questions of whether the defendant was afraid of being apprehended and whether the defendant thought [he][she] had committed a crime. Consciousness of guilt may not be considered [in determining the degree of defendant's guilt] [or in determining which of the charged offenses the defendant committed]."

The issue is a zephyr in a demitasse. In this particular factual scenario, Jeen had plenty of reason to flee, whatever the object of the conspiracy. She was, at a minimum, involved in several felonies at her sister's apartment. The jurors could hardly have assumed evidence of flight only went to the most serious of the those alleged. Single-celled creatures, lesser lichen, and common tubers might think that way, perhaps.

In any event, the purpose of the flight instruction is to protect the defendant from the jury's simply assuming guilt from flight. That was accomplished by the standard instruction. And the addition proposed by the defense—that "[c]onsciousness of guilt may not be considered" in determining which of the charged offenses might have been committed, or their degree, is somewhat illogical, it seems to us, because many people would run from a felony, but few from an infraction.

## V

Bryant argues the court erred in permitting the bullet and shell casing found at the San Diego car rental agency in evidence because there was no foundation that the car containing the evidence was the one turned in by Jeen. None of the defendants objected to the testimony concerning these items; they only objected when they were actually moved into evidence. Although the prosecutor made use of the shell casing to suggest defendants had test-fired the weapon before the home invasion, he could have done the same based on the testimony alone.

There could have been no prejudice anyway. Armed burglars presumably would prefer functioning weapons about as much as those bent on murder. The loaded gun, safety off, in the laundry basket was the tiger in defendants' tent. These items were less than mosquitoes on the netting outside.

## VI

Defendants proposed a modification to CALJIC No. 2.01, the standard instruction on the sufficiency of circumstantial evidence. This issue concerns

the use of the word "innocence" in that instruction ("if the circumstantial evidence [is susceptible of] two reasonable interpretations, one of which points to the defendant's guilt and the other to [his] [her] *innocence,* you must adopt that interpretation that points to the defendant's *innocence* . . . ."). (CALJIC No. 2.01, italics added.) The defense modification would have substituted a lack of finding of guilt for one of innocence. We recognize the semantic difference and appreciate the defense argument. We might even speculate that the instruction will be cleaned up eventually by the CALJIC committee to cure this minor anomaly, for we agree that the language is inapt and potentially misleading in this respect *standing alone.*

However, this court and others have consistently determined that there could be no harm because the other standard instructions make the law on the point clear enough, particularly CALJIC No. 2.90. (*People v. Estep* (1996) 42 Cal.App.4th 733, 738-739 [49 Cal.Rptr.2d 859]; *People v. Wade* (1995) 39 Cal.App.4th 1487, 1497 [46 Cal.Rptr.2d 645]; see also *People v. Wilson* (1992) 3 Cal.4th 926, 943 [13 Cal.Rptr.2d 259, 838 P.2d 1212].) While a trial judge would do better, we think, to give the modifications proposed here, we find no reversible error considering the instructions as a whole.

## VII

The Attorney General concedes, and we agree, that the concurrent terms imposed on both defendants per count 4, false imprisonment, should have been stayed pursuant to Penal Code section 654.[8] The abstracts of judgment are ordered modified accordingly. (Pen. Code, § 1260.)

As modified, the judgments are affirmed.

Sills, P. J., and Rylaarsdam, J., concurred.

A petition for a rehearing was denied March 10, 2000, and appellants' petition for review by the Supreme Court was denied June 14, 2000.

---

[8]Finding little to cumulate, we decline to address Bryant's claim of cumulative error.