[No. D040622. Fourth Dist., Div. One. July 17, 2003.]

THE PEOPLE, Plaintiff and Respondent, v.
JACOB ISAAC HENDERSON, Defendant and Appellant.

■■■■

## COUNSEL

George L. Schraer, under appointment by the Court of Appeal, for Defendant and Appellant.

Bill Lockyer, Attorney General, Robert R. Anderson, Chief Assistant Attorney General, Gary W. Schons, Assistant Attorney General, Robert M. Foster and Jeffrey J. Koch, Deputy Attorneys General, for Plaintiff and Respondent.

## OPINION

**HUFFMAN, P. J.**—A jury convicted Jacob Henderson of two counts of first degree murder, with special circumstances, and one count of second degree murder. (Pen. Code,[1] §§ 187, subd. (a), 189, 190.2, subd. (a)(3).) The jury found true allegations of use of a deadly weapon in each murder. (§ 12022, subd. (b).)

After two penalty trials in which the juries could not reach unanimous verdicts, the prosecution abandoned its efforts to obtain a death penalty. Henderson was sentenced to two consecutive terms of life without parole, consecutive to a 15-year-to-life term for second degree murder plus terms for the deadly weapons enhancements.

Henderson appeals raising a single contention. He contends the trial court erred in failing to instruct the jury on the principles of flight as it related to a third party, whom the defense contended could have committed two of the murders. We will affirm.

### STATEMENT OF FACTS

The three murders in this case occurred in late 1990 and early 1991. Henderson confessed to the three murders after he was arrested in 1999 for a totally unrelated offense. As Henderson does not challenge either the admissibility or the sufficiency of the evidence to support his convictions, we will recite only a summary of the facts in order to give context to the claim of instructional error.

[1] All further statutory references are to the Penal Code unless otherwise specified.

The first murder was committed on November 30, 1990. Henderson had been drinking with friends in Golden Hills Park. Henderson observed Garland Platter, a 62-year-old transient who was drinking wine in the park. Henderson did not know Platter, but walked up to him and asked what he was doing. Platter responded: "I'm sitting here drinking." Suddenly Henderson remembered a transient had raped his mother several years before. He thought Platter might have been responsible for that crime. Henderson offered Platter a beer, which Platter refused. Henderson said that set him off: "And then, I don't know, there's something about that just made me nut up." Henderson said he "freaked out on him."

Henderson picked up a rock and smashed it into Platter's head four or five times. Once Platter was dead, Henderson used pruning shears to cut off Platter's penis. He then placed the severed penis in Platter's mouth. Henderson said he threw the rock down an embankment and then covered Platter with a blanket.

Platter's body was discovered in the place where Henderson left it. Police were called to the scene. A later autopsy established that Platter died from blunt force head injury and asphyxia from compression of the neck.

The next two murders occurred on January 29, 1991. According to Henderson, he met George Morales in 1990, in a downtown bar. During the four months that followed the meeting, Henderson and Morales developed a sexual relationship. Henderson then discovered that Morales was seeing someone else. Henderson said he became angry and used. He felt that Morales "was a bad person for what he was doing." He decided that "it was best to kill him." Henderson said he had thought about killing Morales before he killed the man in Golden Hills Park. Once he killed Platter, it "kind of opened the door." Henderson decided to have sex with Morales and then kill him afterwards so he would be unsuspecting.

Henderson said that around January 29, 1991, he went to Morales's apartment on Monroe Avenue in San Diego, near the intersection of 53rd Street and El Cajon Boulevard. Henderson had been told that Morales's roommate was in the hospital. Morales admitted Henderson into the apartment. Once inside, Henderson knocked Morales down. He had planned to tie up Morales and the strangle him. He hit Morales multiple times but could not knock him out. Henderson went to the kitchen, obtained a knife and came back and stabbed Morales four or five times in the area of the heart, but Morales still would not die. Morales tried to crawl away and called for help from his roommate who was actually in another bedroom, behind a locked door. Henderson stabbed Morales in the neck with great force, after which Morales fell over dead.

Henderson then went to the locked bedroom and kicked in the door. There he found the roommate, Leonard Turner, on the phone dialing 911. Henderson seized the phone from Turner who was knocked to the floor. Henderson immediately stabbed Turner two or three times in the heart. He said that Turner was easy to kill.

After he determined that Turner was dead, Henderson found a rag and wiped down everything he had touched to clean up any evidence. He took $400 from Morales's wallet. Henderson then went to the bathroom, washed off the knife handle and left the knife in the sink.

## DISCUSSION

During the jury instruction conference in the trial court, defense counsel made a request that the court instruct the jury on the principles of flight as it related to the person identified by the defense as a possible third party suspect. The court declined the instruction, but advised counsel that if she could find any case law to support such instruction, the court would give it. Counsel had not submitted a draft of any proposed instruction, but indicated she would research the issue. The record does not reflect any further discussion of the proposed instruction, although defense counsel argued the fact of the third party's departure from the state as relevant on the issue of reasonable doubt as to the identity of the killer of Morales and Turner. The third party culpability defense was never offered as to the first victim, Platter.

The trial court did permit the defense to introduce evidence of possible third party culpability pursuant to the principles set forth in *People v. Hall* (1986) 41 Cal.3d 826 [226 Cal.Rptr. 112, 718 P.2d 99]. Such evidence was admitted on the theory that the third party was so closely connected to the crime that a jury might find a reasonable doubt as to whether Henderson committed two of the murders. The trial court instructed the jury that it could consider the activities of the third party in determining if the prosecution had met its burden of proof.

Henderson now contends that a defendant who relies on a defense of third party culpability is entitled to an instruction on the effect of flight of the third party, where such may be relevant to the issue of reasonable doubt. ■ In the abstract we are inclined to agree with Henderson that evidence of flight by a third party after being accused of a crime or after acquiring knowledge of the crime, could be relevant to the jury's determination of whether the third party's conduct raises a reasonable doubt as to the identity of the perpetrator. Accordingly, we believe a defendant would be entitled to a special instruction, in the nature of a pinpoint instruction, if properly prepared and submitted by the defense. (See *People v. Sears* (1970) 2 Cal.3d 180

[84 Cal.Rptr. 711, 465 P.2d 847].) On the other hand, we are satisfied there is no authority which would compel a trial judge to draft such an instruction or to give it on the court's own motion.

■ There is a sua sponte duty on the part of trial judges to give a jury instruction on the effects of flight as it relates to a defendant in a criminal case. That duty arises from section 1127c, which provides: "In any criminal trial or proceeding where evidence of flight of a defendant is relied upon as tending to show guilt, the court shall instruct the jury substantially as follows: The flight of a person immediately after the commission of a crime, or after he is accused of a crime that has been committed, is not sufficient in itself to establish his guilt, but is a fact which, if proved, the jury may consider in deciding his guilt or innocence. The weight to which such circumstance is entitled is a matter for the jury to determine. No further instruction on the subject of flight need be given."

The jury instruction currently in use to implement section 1127c is CALJIC No. 2.52, which provides: "The [flight] [attempted flight] [escape] [attempted escape] [from custody] of a person [immediately] after the commission of a crime, or after [he] [she] is accused of a crime, is not sufficient in itself to establish [his] [her] guilt, but is a fact which, if proved, may be considered by you in the light of all other proved facts in deciding whether a defendant is guilty or not guilty. The weight to which this circumstance is entitled is a matter for you to decide."

Plainly, both the code section and the CALJIC instruction deal with the charged defendant and address the proper uses of the evidence of flight. The focus of the instruction is on the defendant and the question of whether there was flight and whether it is reasonable to infer consciousness of guilt from such flight. The instruction goes on to limit the jury's use of the evidence in that it advises the jury that flight alone cannot support a finding of guilt. Thus CALJIC No. 2.52 serves the dual purpose of permitting an inference of guilt, but at the same time provides the defendant with some protection against misuse of such evidence. (*People v. Han* (2000) 78 Cal.App.4th 797, 808 [93 Cal.Rptr.2d 139]; *People v. Batey* (1989) 213 Cal.App.3d 582, 586 [261 Cal.Rptr. 674]. Under current law the trial court has no sua sponte duty to modify CALJIC No. 2.52. (*People v. Prysock* (1982) 127 Cal.App.3d 972, 1002–1003 [180 Cal.Rptr. 15].) In order to use an instruction such as CALJIC No. 2.52 to deal with alleged flight by a third party, the instruction would have to be totally rewritten. The focus would shift to the third party and would be for the purpose of determining if such flight points to a reasonable doubt as to the identity of the perpetrator. Further, the court would have to determine if like section 1127c, no knowledge of the crime by the third party would have to be demonstrated in order to justify the instruction, or whether

the court should revert to the common law view that the person had to first be accused or at least aware of the crime. (See *People v. Hill* (1967) 67 Cal.2d 105, 120 [60 Cal.Rptr. 234, 429 P.2d 586].)

Neither the parties to this appeal nor this court has found any California case, which addresses the question of an instruction on flight of a third party. Henderson has, however, found authority from Pennsylvania, which does address the issue.

The most recent of the Pennsylvania cases cited by Henderson, *Commonwealth v. Milligan* (Pa. Super. Ct. 1997) 693 A.2d 1313, 1317, indicates, without any significant analysis, that flight could be relevant to the question of whether a third party's actions raise a reasonable doubt. Accordingly, the court concluded that a defendant should also be able to obtain an instruction to the jury on such issue. To a great extent, the Pennsylvania court's analysis is reminiscent of the reasoning of *People v. Sears, supra,* 2 Cal.3d 180, and the cases which have followed it.[2] The essential conclusion of the Pennsylvania court was that third party flight could be relevant to the issue of identity in a given case. Accordingly a defendant should be able to obtain an appropriate instruction on the issue. ■ We view such analysis as consistent with the *Sears* line of authority that permits a defendant to obtain a special or pinpoint instruction on an issue relevant to the defendant's efforts to raise a reasonable doubt. Logically, a properly tailored instruction could assist a jury in determining what weight, if any, to give to the alleged flight of a person about whom the court has permitted evidence of third party culpability. It would seem that a jury could draw an inference, favorable to the defendant, if a person, so closely connected with a crime as to permit the admission of third party evidence, from that person's abrupt departure from the area upon learning of the discovery of a crime. Such inference would be permissive and would potentially be a factor to be considered in determining whether the prosecution has proved identity beyond a reasonable doubt.

■ Thus we are persuaded that a defendant relying on a third party culpability defense is entitled to have the trial court give an appropriate pinpoint instruction on the issue of the alleged flight of the third party upon proof that the third party was aware of the discovery of the charged crime. We have not been presented with any authority or reasoning that would justify holding that trial courts have a sua sponte duty to give such instruction without request.

---

[2] We have found one other state court, which has discussed the issue of third party flight and the right to jury instruction on that issue. In *State v Jackson* (2000) 137 N.C. App. 570 [529 S.E.2d 253], the North Carolina Court of Appeals concluded that a defendant was not entitled to such instruction. The court said: "An instruction on flight is therefore *sui generis* to the flight of a *defendant,* and does not apply to any alleged flight of a witness." (*Id.* at p. 257.)

Although we agree that Henderson might have been entitled to an appropriate pinpoint instruction in this case, none was offered. The trial judge had no duty to craft such instruction for the defense, thus we find no error by the trial court.

Even if the court had a duty to assist counsel in drafting an instruction, any error in this case was plainly harmless. The trial court did inform the jury of the purpose of the third party defense evidence, namely to address the question of whether the prosecution had proved identity of the perpetrator beyond a reasonable doubt. Further, trial counsel argued the matter of the alleged flight of the third party during closing arguments. Thus the jury was clearly aware that the conduct of the third party was important in evaluating the issue of identity. All of the defendant's evidence regarding possible third party liability was admitted and before the jury. In the end, the jury was satisfied beyond a reasonable doubt that Henderson killed Morales and Turner in the manner he voluntarily described to police.

The evidence of third party culpability was quite weak. At best it demonstrated Witmer, the identified third party, was a male prostitute who had some undefined relationship with Morales. It also showed some vague and possibly conflicting statements regarding Witmer's knowledge of the Morales/Turner killings. Witmer had possibly observed the crime scene, or may have seen the killer. It was also possible that Witmer made inconsistent statements regarding his knowledge of the crimes.

The evidence was also clear that Witmer lead a transient lifestyle. He was a male prostitute who moved about the country a great deal. At some point following the Morales/Turner murders, Witmer was either in Iowa, Arizona or Texas. He apparently returned to San Diego at some point but did not contact police.

There was no evidence offered connecting Witmer with the commission of the crimes. No evidence as to a possible motive for Witmer to commit two murders was presented to the jury. In any event, the jury was fully informed of Witmer's activities and that it could consider such activities on the issue of identity of the perpetrator.

Given the weakness of the third party defense evidence, the fact the court instructed the jury generally on the subject, and the detailed confession of Henderson to the murders, we are satisfied beyond a reasonable doubt that any error in failing to instruct on third party flight did not contribute to the convictions. Any such error was harmless. (*People v. Mask* (1986) 188 Cal.App.3d 450, 456 [233 Cal.Rptr. 181]; *People v. Watson* (1956) 46 Cal.2d 818, 836 [299 P.2d 243].)

## DISPOSITION

The judgment is affirmed.

Nares, J., and Haller, J., concurred.

Appellant's petition for review by the Supreme Court was denied October 29, 2003.