Filed 2/22/21  P. v. Pratt CA1/3
**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIRST APPELLATE DISTRICT

DIVISION THREE

| | |
|---|---|
| THE PEOPLE,<br><br>  Plaintiff and Respondent,<br><br>v.<br><br>ANTHONY PRATT,<br><br>  Defendant and Appellant. | A154907<br><br>(City & County of San Francisco<br>Super. Ct. No. 221133-01) |
| THE PEOPLE,<br><br>  Plaintiff and Respondent,<br><br>v.<br><br>TRUMILLION BALLARD,<br><br>  Defendant and Appellant. | A155287<br><br>(City & County of San Francisco<br>Super. Ct. No. 221133-02) |

In these consolidated cases, defendants Anthony Pratt and Trumillion Ballard appeal from judgments entered after a jury found them guilty of murder and conspiracy to commit murder.  Defendant Ballard was also convicted of being a felon in possession of a firearm, and the jury found true the enhancement against him for discharging a firearm in the commission of murder.  Pratt contends there was insufficient evidence of conspiracy to commit murder, the trial court erred by not instructing on lesser included offenses of conspiracy to commit assault and conspiracy to commit assault

1

with a firearm, and the trial court erred by not instructing on CALCRIM No. 418 regarding foundational facts of a coconspirator's statement. Pratt also asserts the trial court erred by excluding evidence of the context of a threat made against the victim on the day he was killed. Ballard joins in Pratt's arguments and further asserts his murder conviction should be reversed because the verdict was likely based on lying in wait, for which he claims there is no substantial evidence. Ballard also argues his case should be remanded for an ability to pay hearing and for the trial court to exercise its discretion as to whether to impose a lesser, uncharged firearm enhancement.

We affirm.

## FACTUAL AND PROCEDURAL BACKGROUND

### I. *Charges and Convictions*

The defendants were charged in an amended information with murder (Pen. Code, § 187, subd. (a); count I)[1] and conspiracy to commit murder (§ 182, subd. (a)(1); count II). The information further charged Ballard with being a felon in possession of a firearm (§ 29800, subd. (a)(1); count III) and alleged that he personally discharged a firearm in the commission of the murder (§ 12022.53, subd. (d)). On April 5, 2018, the jury found the defendants guilty as charged and found the firearm enhancement allegation to be true.

Pratt was sentenced to 25 years to life in prison, and Ballard was sentenced to 50 years to life in prison. Various fines and fees were imposed on Ballard, and he was ordered to pay restitution.

---

[1] All statutory references are to the Penal Code unless otherwise stated.

## II.  *Facts Regarding Conspiracy and Murder*

We state the facts in the light most favorable to the judgment.  (*People v. Ochoa* (1993) 6 Cal.4th 1199, 1206.)  The convictions arise out of the homicide of Gary Elliott Smith on July 13, 2012, in San Francisco.  Along with eyewitness testimony, the defendants' actions leading up to the shooting and the shooting itself were captured on multiple video surveillance cameras.  Smith's girlfriend, K.H., witnessed the shooting and the earlier threat that led up to the shooting.  Further, telephone records were also introduced showing communications between Pratt and an uncharged conspirator, S.W., before and after the shooting.

On July 13, 2012, around 12:45 p.m., K.H. witnessed S.W.[2] confront Gary Smith as he walked to a convenience store on Sixth Street in San Francisco near where K.H. lived.  K.H. heard S.W. say that "[i]f Gary wouldn't give her the money for the dog or something . . . he would be tasting bullets." [3]

A compilation of the surveillance video from multiple locations on Sixth Street on the night of July 13, 2012, was shown to the jury and narrated by Sergeant Oscar Barcena.  The video showed Pratt and Ballard walking down Sixth Street around 10:30 p.m.  S.W.'s phone records show calls between S.W. and Pratt around 10:30 p.m.  At 10:41 p.m., Pratt and Ballard went into a convenience store, and then they walked along Sixth Street.  S.W. was with

---

[2] At the time of the homicide of Smith, Pratt and S.W. were in a romantic relationship.  Evidence from Pratt's and S.W.'s cell phones included photographs, explicit videos, and multiple text messages between the two, including texts stating, " 'I love you.' "

[3] S.W. was not charged.  During pretrial hearings, she was subpoenaed by the People and invoked her Fifth Amendment privilege against self-incrimination and did not answer any questions regarding the homicide.

defendants on Sixth Street around 10:48 p.m. At 10:56 p.m., Ballard returned to the convenience store, adjusted something around his waistband, and left.

At 11:05 p.m., S.W. walked by Smith and K.H., who were standing outside near K.H.'s apartment building. S.W. headed in the direction of Pratt's silver Pontiac parked on Mission Street. K.H. testified S.W. walked past the building "really fast." Phone records show that S.W. called Pratt at 11:06 p.m. and Pratt called her at 11:08 p.m.

At 11:09 p.m., the defendants walked along Sixth Street toward Smith. As they walked closer to Smith, Pratt, who is larger than Ballard, walked ahead, partially blocking Ballard. As Pratt passed Smith, Pratt looked directly at Smith and made a gesture toward him. Ballard immediately moved closer to Smith, pulled out a gun and fired three shots, hitting Smith at close range twice in the head and once in the hand. Smith died at the scene. K.H. was standing next to Smith when he was shot. She testified she saw the defendants and S.W. together by the convenience store just prior to the shooting.

After the shooting, the defendants ran around the corner onto Mission Street. They got into Pratt's silver Pontiac. N.M., a passerby who was looking for parking, noticed the Pontiac because initially its lights were on. N.M. parked in front of the Pontiac, and then he saw the Pontiac's lights turn off. After he parked, he heard three shots and saw two men come from around the corner, get into the Pontiac and drive away. G.W. was in the car with N.M. and also saw two men run and get into the Pontiac after gunshots were fired. G.W. called 911, and when the police arrived, G.W. gave them the Pontiac's license plate number.

The Pontiac was registered to Pratt. Cell phone tower records indicated that the cell phones owned by Pratt and S.W. traveled over the Bay Bridge after the shooting. Pratt called S.W. at 1:25 a.m. and 1:57 a.m. on July 14, 2012. At 2:31 a.m., S.W. texted Pratt, "I really love u," and Pratt texted back, "I love you too baby . . . ." Later that day, the police located the Pontiac at a residence in Union City. The police surveilled the residence, and when two men left in the Pontiac, the police followed them. When the police stopped the car, Pratt complied and was arrested. Ballard, who was the passenger, fled but was ultimately apprehended with the assistance of a police dog.

K.H. identified both defendants at trial. Additionally, Assistant Chief Toney Chaplin of the San Francisco Police Department, who was familiar with Ballard from prior contacts, identified him as the person in the surveillance footage who shot Smith. Pratt was shown the video during his police interview and admitted, " 'That's me.' "

Neither defendant testified. Ballard's defense was misidentification. Pratt's defense was that he did not know about the shooting in advance and merely aided the shooter in escaping.

## DISCUSSION

### I. *Substantial evidence supports defendants' convictions for conspiracy to commit murder.*

Pratt argues no substantial evidence demonstrates that the object of the conspiracy was murder, "as opposed to other forms of intimidation . . . ." Ballard joins in this argument. " 'To determine the sufficiency of the evidence to support a conviction, an appellate court reviews the entire record in the light most favorable to the prosecution to determine whether it contains evidence that is reasonable, credible, and of solid value, from which a rational trier of fact could find the defendant guilty beyond a reasonable doubt.' "

5

(*People v. Jurado* (2006) 38 Cal.4th 72, 118.) "Evidence is sufficient to prove a conspiracy to commit a crime 'if it supports an inference that the parties positively or tacitly came to a mutual understanding to commit a crime. [Citation.] The existence of a conspiracy may be inferred from the conduct, relationship, interests, and activities of the alleged conspirators before and during the alleged conspiracy. [Citations.]' " (*People v. Rodrigues* (1994) 8 Cal.4th 1060, 1135.)

" 'A conviction of conspiracy requires proof that the defendant and another person had the specific intent to agree or conspire to commit an offense, as well as the specific intent to commit the elements of that offense, together with proof of the commission of an overt act "by one or more of the parties to such agreement" in furtherance of the conspiracy.' " (*People v. Jurado, supra*, 38 Cal.4th at p. 120.) "[C]onspiracy may be proved through circumstantial evidence inferred from the conduct, relationship, interests, and activities of the alleged conspirators before and during the alleged conspiracy." (*People v. Prevost* (1998) 60 Cal.App.4th 1382, 1399, disapproved on other grounds in *People v. Dalton* (2019) 7 Cal.5th 166, 243.)

According to Pratt, the surveillance video evidence showed only his association with Ballard on Sixth Street, which is not sufficient to infer a criminal conspiracy to commit murder. Further, Pratt argues the phone records establish an association between himself and S.W. but are not evidence of conspiracy to commit murder with Ballard. Pratt relies on K.H.'s testimony that Pratt " 'didn't say nothing to me' " and " 'didn't do nothing' " in support of his argument that there was no evidence of his direct participation in the crime, and he asserts there is insufficient evidence of motive.

The flaw in Pratt's argument is that he focuses on each piece of evidence in isolation. This is not a case where the evidence shows only "mere association and suspicion of criminal conduct" insufficient to establish conspiracy. (*People v. Tran* (2013) 215 Cal.App.4th 1207, 1221.) Pratt's communications and association with S.W., and his conduct with Ballard before, during, and after the murder, support the jury's findings. (See *People v. Jurado, supra*, 38 Cal.4th at p. 121 ["Although there is no direct evidence that defendant and [an accomplice] discussed in advance the killing of [the victim], there was evidence that they were alone together . . . shortly before the killing, during which a discussion and agreement could have taken place"].) Earlier in the day, S.W. told the victim he would be "tasting bullets." Just before the shooting, she walked by the victim toward Pratt's car. Phone records showed calls between S.W. and Pratt at 11:06 p.m. and 11:08 p.m., minutes before the shooting. The jury could reasonably infer the conversation related to the shooting because S.W. had been on the street with Ballard and Pratt that night; she walked by the victim moments before the calls, in the direction of Pratt's car; and immediately after the shooting, Pratt and Ballard left the scene in Pratt's car. Further, phone records indicated S.W. left with them. (See *People v. Maciel* (2013) 57 Cal.4th 482, 518–519 ["Calls to defendant's pager by [other participants in the murder] before and after the murders also demonstrated defendant's knowledge of the plan and his assistance in its accomplishment"].)

The manner of the shooting suggests it was planned in advance and belies Pratt's argument that the object of the conspiracy might have been some "other form[] of intimidation . . . ." Ballard walked down the street behind Pratt, and then when the two reached Smith, Ballard immediately pulled out his gun and shot Smith three times, twice in the head and once in

the hand. (See *People v. Tran* (1996) 47 Cal.App.4th 759, 773 [argument that conspiracy might have been "to commit only a nonfatal assault [wa]s undermined by the fact that [the victim] was shot in the head"].) Pratt argues that the surveillance video shows he raises his arms and is "shocked by the gunshot" and that this reaction does not support a finding that he planned the shooting. But, as the prosecutor argued to the jury, Pratt's physical movements at the moment shots are fired within a foot of his ear could be reasonably interpreted as either part of his effort to quickly flee the scene or an involuntary physical reaction to loud gunshots right behind him.

Further, Pratt's reliance on K.H.'s testimony that Pratt " 'didn't say nothing to me" and " 'didn't do nothing' " ignores the evidence on the surveillance video. Pratt was in front of Ballard as they walked by Smith, partially blocking Ballard from Smith's view. Immediately before the shooting, Pratt catches Smith's attention with a gesture or a nod. From this evidence and Pratt's fleeing the scene in his car with Ballard immediately after the shooting, the jury could have reasonably inferred that Pratt actively assisted Ballard in the shooting.

When taken as a whole, the evidence presented to the jury is sufficient to support a conspiracy to commit murder, the existence of which " 'may be inferred from the conduct, relationship, interests, and activities of the alleged conspirators before and during the alleged conspiracy.' " (*People v. Rodrigues, supra*, 8 Cal.4th at p. 1135.)

## II. *Substantial evidence supports Ballard's murder conviction under a lying in wait theory.*

Ballard argues insufficient evidence supports his first degree murder conviction under a lying in wait theory. The jury was instructed on first degree murder under two theories: murder by lying in wait and murder that

8

was willful, deliberate and premeditated.[4] Ballard does not argue there was insufficient evidence of willfulness, deliberation and premeditation, and,

[4] The trial court instructed the jury with CALCRIM No. 521 as follows:

"A defendant has been prosecuted for first degree murder under two theories: (1) the murder was willful, deliberate, and premeditated and (2) the murder was committed while lying in wait or immediately thereafter.

"Each theory of first degree murder has different requirements, and I will instruct you on both.

"You may not find the defendant guilty of first degree murder unless all of you agree that the People have proved that the defendant committed murder. But all of you do not need to agree on the same theory.

"A defendant is guilty of first degree murder if the People have proved that he acted willfully, deliberately, and with premeditation. The defendant acted *willfully* if he intended to kill. The defendant acted *deliberately* if he carefully weighed the considerations for and against his choice and, knowing the consequences, decided to kill. The defendant acted with *premeditation* if he decided to kill before completing the act that caused death.

"The length of time the person spends considering whether to kill does not alone determine whether the killing is deliberate and premeditated. The amount of time required for deliberation and premeditation may vary from person to person and according to the circumstances. A decision to kill made rashly, impulsively, or without careful consideration is not deliberate and premeditated. On the other hand, a cold, calculated decision to kill can be reached quickly. The test is the extent of the reflection, not the length of time.

"A defendant is guilty of first degree murder if the People have proved that the defendant murdered while lying in wait or immediately thereafter. The defendant murdered by lying in wait if:

"1. He concealed his purpose from the person killed;

"2. He waited and watched for an opportunity to act;

"AND

"3. Then, from a position of advantage, he intended to and did make a surprise attack on the person killed.

"The lying in wait does not need to continue for any particular period of time, but its duration must be substantial enough to show a state of mind equivalent to deliberation or premeditation.

"A person can conceal his or her purpose even if the person killed is aware of the person=s [*sic*] physical presence.

therefore, even if we were to conclude that there was insufficient evidence to support the alternative lying in wait theory, reversal would not be required unless there was an affirmative indication in the record that the verdict actually rested on the inadequate ground. (*People v. Guiton* (1993) 4 Cal.4th 1116, 1129 ["If the inadequacy of proof is purely factual, of a kind the jury is fully equipped to detect, reversal is not required whenever a valid ground for the verdict remains, absent an affirmative indication in the record that the verdict actually did rest on the inadequate ground"].)[5]

We find substantial evidence supports the lying in wait murder theory. "Lying-in-wait murder consists of three elements: ' " '(1) a concealment of purpose, (2) a substantial period of watching and waiting for an opportune time to act, and (3) immediately thereafter, a surprise attack on an unsuspecting victim from a position of advantage . . . .' " ' " (*People v. Russell* (2010) 50 Cal.4th 1228, 1244.) As to the first element, from the surveillance video a jury could reasonably conclude that Ballard concealed his gun in his

---

"The concealment can be accomplished by ambush or some other secret plan.

"The requirements for second degree murder based on express or implied malice are explained in CALCRIM No. 520, *First or Second Degree Murder With Malice Aforethought*.

"The People have the burden of proving beyond a reasonable doubt that the killing was first degree murder rather than a lesser crime. If the People have not met this burden, you must find the defendant not guilty of first degree murder and the murder is second degree murder."

[5] Ballard argues that any error regarding the lying in wait theory "is part factual error and part legal error" and, therefore, we should review the alleged error as based on a "legally incorrect theory" such that reversal is required when a reviewing court cannot determine from the record on which theory the verdict rested. (*People v. Stutelberg* (2018) 29 Cal.App.5th 314, 318.) We need not decide this issue because we find substantial evidence supports the lying in wait theory.

10

waistband in the convenience store and then continued to conceal it as he walked down the street toward the victim. Further, the video shows that at the time of the shooting, Ballard was partially blocked from the victim's view by Pratt, who was a larger man walking ahead of Ballard. This evidence supports a finding that Ballard concealed his purpose before killing Smith.

As to the second element of a substantial period of watching and waiting, again, the surveillance video from multiple locations on Sixth Street shows that Ballard was on the victim's block for over an hour before he shot Smith. Further, there was testimony that S.W. walked by the victim heading in the direction of Pratt's car just before the shooting, and phone records show that after she walked by the victim, she then called Pratt. Minutes later, defendants walked up to Smith and Ballard shot him. (See *People v. Ward* (1972) 27 Cal.App.3d 218, 227, 229, fn. 3 [finding substantial evidence of watching and waiting where defendant waited in car with a knife while he sent another person to make sure victim was home before defendant approached the victim's apartment].)

Finally, the surveillance video, in which Ballard walks closely behind Pratt as he approaches Smith on the sidewalk and then suddenly pulls out his gun once he is directly in front of Smith, is substantial evidence that Ballard obtained a position of advantage before shooting Smith and that Smith was taken by surprise and had no time to react. (See *People v. Russell, supra*, 50 Cal.4th at p. 1245.)

## III.   *Failure to Instruct on Lesser Included Offenses*

Pratt argues the trial court erred in failing to instruct sua sponte on conspiracy to commit assault and conspiracy to commit assault with a firearm, which he contends are lesser included offenses of conspiracy to commit murder. Ballard joins in this argument. According to the

11

defendants, the overt acts alleged in the conspiracy to commit murder count, which include that Ballard brought a loaded firearm to Sixth Street and that he shot Smith, warranted an instruction on conspiracy to commit assault and conspiracy to commit assault with a firearm.

There are two tests to determine if an uncharged offense is included in a charged offense. (*People v. Parson* (2008) 44 Cal.4th 332, 349.) "Under the elements test, a court determines whether, as a matter of law, the statutory definition of the greater offense necessarily includes the lesser offense." (*Ibid.*) The defendants concede that under the elements test, neither conspiracy to commit assault nor conspiracy to commit assault with a firearm is a lesser included offense of conspiracy to commit murder. The second test is the accusatory pleading test under which "a court reviews the accusatory pleading to determine whether the facts actually alleged include all of the elements of the uncharged lesser offense; if it does, then the latter is necessarily included in the former." (*Ibid.*)

The parties acknowledge a split in authority regarding the accusatory pleading test in conspiracy cases. *People v. Fenenbock* (1996) 46 Cal.App.4th 1688 held that because the essence of conspiracy is the coconspirators' agreement itself, and because overt acts need not be committed by the defendants and need not even be criminal, such acts "do not necessarily reveal the criminal objective of the conspiracy" and therefore do not provide notice of any allegedly lesser "target" offenses. (*Id.* at p. 1709.) "[I]t is the description of the agreement within the accusatory pleading, not the description of the overt acts, which must be examined to determine whether a lesser offense was necessarily the target of the conspiracy." (*Ibid.*) Because the conspiracy charge in *Fenenbock* alleged only that the defendants "conspired to murder [the victim]," it did not necessarily include assault,

battery, or mayhem as lesser target offenses of the conspiracy, and therefore the trial court did not err in failing to give instructions of conspiracy to commit lesser target offenses.  (*Ibid.*)

*People v. Cook* (2001) 91 Cal.App.4th 910, 920–921, disagreed with *Fenenbock* and held that a court may consider the overt acts alleged in determining whether a conspiracy charge necessarily includes any lesser target offenses.  The charging document in *Cook* alleged only conspiracy to commit murder, but the court found it gave notice of conspiracy to commit assault with a firearm because two of the alleged overt acts involved use of a firearm.  (*Id.* at pp. 921–922.)  Therefore, *Cook* found the trial court properly instructed on the lesser conspiracy offense.  (*Id.* at p. 920.)

More recently, *People v. Cortez* (2018) 24 Cal.App.5th 807 rejected much of the reasoning of *Cook*.  *Cortez* agreed that overt act allegations may be considered in determining lesser included offenses because "there may be overt act allegations establishing that the defendant has agreed or conspired to commit lesser included target offenses."  (*Id.* at p. 820.)  However, an instruction on a lesser included offense is not required where "the accusatory pleading did not allege that the defendants agreed to commit any crime, other than murder."  (*Ibid.*)  *Cortez* found that although the alleged overt acts could support offenses of assault with a firearm and shooting at an inhabited dwelling, instruction on conspiracy to commit those offenses was not required "because there [we]re no allegations of the requisite element of defendant agreeing or conspiring to commit those target offenses."  (*Id.* at p. 821.)

Here, under the reasoning of *Fenenbock* and *Cortez*, there was no duty to instruct on conspiracy to commit lesser offenses because the information

13

alleged the defendants conspired to commit murder and it did not describe an agreement to commit any lesser offenses.[6]

Even assuming *Cook* is applicable and the accusatory pleading test is met because two of the overt acts involve use of a firearm, we conclude the trial court did not err in refusing to instruct the jury on conspiracy to commit lesser offenses. A "trial court must instruct a criminal jury on any lesser offense 'necessarily included' in the charged offense, if there is substantial evidence that only the lesser crime was committed." (*People v. Birks* (1998) 19 Cal.4th 108, 112.) We find no substantial evidence that only conspiracy to commit assault or conspiracy to commit assault with a firearm was committed. As discussed above, there was substantial evidence of conspiracy to commit murder.

Pratt argues the evidence, including the surveillance video, is not inconsistent with "something less than homicidal intent" and that text messages sent from S.W. to Pratt 15 minutes before the murder indicate "something less than homicidal intent." Phone records admitted into evidence showed that at 10:54 p.m. S.W. texted Pratt, "Tell him beat that nigga ass." (*Sic.*) Two minutes later, S.W. texted Pratt, "No." There was no testimony at trial regarding the meaning of these messages, and speculation does not trigger a court's sua sponte duty to provide instructions on uncharged offenses. (*People v. Mendoza* (2000) 24 Cal.4th 130, 174

---

[6] The amended information alleges the defendants "conspire[d] together and with another person(s) . . . to commit the crime of MURDER" and that in furtherance of the conspiracy, they committed nine overt acts, two of which involve a firearm. Overt act No. 2 alleges, "On or about the 13th day of July, 2012, shortly before 11:10 p.m., . . . Ballard, brought a loaded .40-caliber firearm to 6th Street . . . ." Overt act No. 9 alleges, "Ballard, shot . . . Smith at 74 6th Street, San Francisco (The Baldwin Hotel)."

14

["Speculation is insufficient to require the giving of an instruction on a lesser included offense. [Citations.]"].)

Further, even if we were to find the unexplained text messages constituted sufficient evidence to require the giving of an instruction on lesser included offenses of conspiracy to commit assault or conspiracy to commit assault with a firearm, we would conclude any possible error was harmless. "Error in failing to instruct the jury on a lesser included offense is harmless when the jury necessarily decides the factual questions posed by the omitted instructions adversely to defendant under other properly given instructions." (*People v. Lewis* (2001) 25 Cal.4th 610, 646.) Here, the defendants were convicted of first degree murder. By convicting Ballard of first degree murder, the jury found that he intended to kill Smith and did so either by lying in wait[7] or willfully, deliberately and with premeditation. By convicting Pratt of first degree murder, the jury found that Pratt knew Ballard intended to kill Smith and that Pratt intended to aid Ballard in killing Smith.[8] Thus, the jury necessarily found that both Pratt and Ballard had the specific intent to kill required for conspiracy to commit murder.

---

[7] As discussed above, the jury was instructed with CALCRIM No. 521 explaining first degree murder under two theories: murder that was willful, deliberate, and premeditated; and murder by lying in wait. As part of the lying in wait theory, the jury was instructed, "The lying in wait does not need to continue for any particular period of time, but its duration must be substantial enough to show a state of mind equivalent to deliberation or premeditation." Accordingly, under either murder theory, the jury found an intent to kill.

[8] The jury was instructed with CALCRIM Nos. 400 and 401 regarding aiding and abetting liability. As part of these instructions, the jury was told that to prove Pratt was guilty of a crime based on aiding and abetting, the People must prove Pratt knew the perpetrator of the crime intended to commit the crime and that "[b]efore or during the commission of the crime,

15

## IV.	*"Tasting Bullets" Statement*

Pratt makes two arguments regarding K.H.'s testimony that on the day of the murder, S.W. threatened Smith with "tasting bullets."  First, he argues the trial court erred by failing to instruct the jury with CALCRIM No. 418 requiring that foundational facts be determined in order to consider a coconspirator's statement.  Second, he argues the trial court erred when it limited the defendants' cross-examination of K.H. regarding the context of S.W.'s statement concerning the "dog-debt."  Ballard joins in both arguments. We reject the defendants' claims.

### A.	*CALCRIM No. 418—Coconspirator's Statement*

The defendants argue that because S.W.'s threat that Smith would be "tasting bullets" was only relevant as a statement by a coconspirator (Evid. Code, § 1223), the trial court was required to instruct the jury sua sponte with CALCRIM No. 418.[9]

---

[Pratt] intended to aid and abet the perpetrator in committing the crime" and Pratt did in fact aid and abet the perpetrator in committing the crime.

[9] Evidence Code section 1223 states:  "Evidence of a statement offered against a party is not made inadmissible by the hearsay rule if:

"(a) The statement was made by the declarant while participating in a conspiracy to commit a crime or civil wrong and in furtherance of the objective of that conspiracy;

"(b) The statement was made prior to or during the time that the party was participating in that conspiracy; and

"(c) The evidence is offered either after admission of evidence sufficient to sustain a finding of the facts specified in subdivisions (a) and (b) or, in the court's discretion as to the order of proof, subject to the admission of such evidence."

CALCRIM No. 418 states, in part:  "In deciding whether the People have proved that (the defendant[s] . . . ) committed [any of] the crime[s] charged, you may not consider any statement made out of court by ___ <insert name[s] of coconspirator[s]> unless the People have proved by a preponderance of the evidence that:

16

During pretrial motions, the People argued the statement was admissible through K.H.'s testimony as a statement of a coconspirator (Evid. Code, § 1223), as a declaration against penal interest (Evid. Code, § 1230), under the state of mind hearsay exception (Evid. Code, § 1250), and as a nonhearsay verbal act. The trial court ruled that the People could refer to S.W.'s statement in its opening statement, stating, "[T]he bases are indicated by your non-hearsay declaration as to state of mind and a statement of co-conspirator." Before K.H. testified, the defendants renewed their objections to S.W.'s statement coming in through K.H. and the trial court permitted the testimony.

On appeal, the People concede the statement was not properly admitted under the coconspirator exception because the statement was made before the conspiracy started. Instead, they argue the statement was properly admitted as a nonhearsay declaration of a state of mind.[10] We find the statement was properly admitted under the state of mind exception.

Evidence Code section 1250 provides an exception to the hearsay rule for "evidence of a . . . declarant's then existing state of mind . . . (including a

---

"1. Some evidence other than the statement itself establishes that a conspiracy to commit a crime existed when the statement was made;
"2. ___ <insert name[s] of coconspirator[s]> (was/were) [a] member[s] of and participating in the conspiracy when (he/she/they) made the statement;
"3. ___ <insert name[s] of coconspirator[s]> made the statement in order to further the goal of the conspiracy;
"AND
"4. The statement was made before or during the time that (the defendant[s] . . . ) (was/were) participating in the conspiracy. . . ."

[10] The People also argue the trial court has no sua sponte duty to instruct on CALCRIM No. 418. Because the People concede the coconspirator exception does not apply, we do not address whether, if it did apply, the trial court would have a sua sponte obligation to give CALCRIM No. 418 regarding coconspirator's statements.

17

statement of intent, plan, motive . . . ) . . . when: [¶] (1) The evidence is offered to prove the declarant's state of mind . . . at that time or at any other time when it is itself an issue in the action." S.W.'s state of mind on the day of the murder was relevant because she was an associate of Pratt's and she was seen with Pratt and Ballard the night of the murder. Phone records show text messages and phone calls between her and Pratt around the time of the murder and the next day. Evidence that S.W. threatened Smith hours before the shooting was relevant to the defendants' motive, plan, intent, premeditation, and deliberation and to the existence of the conspiracy. (See *People v. Han* (2000) 78 Cal.App.4th 797, 805 [out of court statements made before conspiracy was formed "were clearly admissible against all defendants per Evidence Code section 1250"]; *People v. Sanders* (1995) 11 Cal.4th 475, 518 [preconspiracy statement admissible to establish declarant's state of mind, "i.e., her intention to form a conspiracy . . . , which was clearly relevant to the issue of whether she subsequently entered into a conspiracy with defendant to commit robbery"].)[11]

---

[11] Pratt argues *People v. Han* does not support the People's position because in *Han* the jury was instructed that statements made by an alleged coconspirator before the formation of the conspiracy could not be used against other alleged conspirators. But, *Han* found that although it was "entirely possible that the jury did not consider [coconspirator's preconspiracy] statements against her confederates[,] . . . they were clearly admissible against all the defendants per Evidence Code section 1250, under impossible to distinguish Supreme Court authority. . . . The Supreme Court has consistently allowed [state of mind] evidence to prove the state of mind of the declarant, *as well as the declarant's confederates*." (*People v. Han, supra*, 78 Cal.App.4th at pp. 805–806, original italics.) *Han* cited *People v. Sanders, supra*, 11 Cal.4th 475, and concluded that "[i]f the jury did consider [coconspirator's preconspiracy] statements to explain her later actions, that was proper." (*Han*, at pp. 806–807.)

S.W.'s statement was properly admitted under the state of mind exception, and therefore it was not necessary for the jury to determine foundational facts to support the coconspirator exception. (*People v. Zapien* (1993) 4 Cal.4th 929, 976 [" ' "No rule of decision is better or more firmly established by authority, nor one resting upon a sounder basis of reason and propriety, than that a ruling or decision, itself correct in law, will not be disturbed on appeal merely because given for the wrong reason. If right upon any theory of the law applicable to the case, it must be sustained regardless of the considerations which may have moved the trial court to its conclusion" ' "].)

B. *Limiting hearsay evidence regarding background of "dog-debt" dispute was not error.*

The defendants argue the trial court erred by limiting their cross-examination of K.H. regarding the context of S.W.'s statement concerning the "dog-debt." K.H. testified that she heard S.W. tell Smith that "[i]f Gary [Smith] wouldn't give her the money for the dog or something . . . he would be tasting bullets." The prosecutor then asked what Smith did in response, and K.H. stated, "Gary [Smith]—Gary was like, What? What? And then I got in between them, and I was just—she was explaining to me what happened about the dog because I never knew about the dog." The prosecutor then stated she did not want to ask about what other people said, other than with respect to the specific threats. K.H. again testified that S.W. told Smith "[t]hat he would be tasting bullets if he—if she—if he didn't give her the money for the—the dog." The prosecutor did not elicit any further testimony from K.H. regarding S.W.'s statements.

On cross-examination, Pratt's counsel asked K.H., "So this person [S.W.] wanted money for the dog, correct?" K.H. responded, "Correct." Pratt's counsel later asked, "And the reason she wanted money was not for

19

herself, but for somebody else?" K.H. responded, "Correct," and Pratt's counsel began to inquire further about "that person" before the prosecutor objected on the grounds of relevance, hearsay, and Evidence Code section 352 and moved to strike K.H.'s answer. The trial court sustained the objection and struck K.H.'s prior answer. Pratt's counsel then asked K.H. if she had any personal knowledge about the dog, and she confirmed she did not because the dog was "before [her] time," which she later clarified meant before her time with Smith. Pratt's counsel later began to inquire about "[Smith's] part of the argument is he was claiming that her boyfriend had given—" The prosecutor again objected based on hearsay and Evidence Code section 352, and Pratt's counsel responded that the entirety of the conversation should be admitted under the rule of completeness. The trial court disagreed and sustained the prosecutor's objections. Outside the presence of the jury, Pratt's counsel argued Evidence Code section 356[12] permitted him to question K.H. about the details of the conversation that included the "tasting bullets" threat. He explained that he wanted to ask three questions regarding S.W.'s claim that Smith owed S.W.'s ex-boyfriend (who was now incarcerated) money for a dog he gave to Smith and that Smith claimed the dog was a gift. The trial court ruled the questions were not relevant and not admissible under Evidence Code section 352.

We review the trial court's evidentiary rulings under the abuse of discretion standard, and the ruling "will ' "not be disturbed on appeal *except*

---

[12] Evidence Code section 356 states: "Where part of an act, declaration, conversation, or writing is given in evidence by one party, the whole on the same subject may be inquired into by an adverse party; when a letter is read, the answer may be given; and when a detached act, declaration, conversation, or writing is given in evidence, any other act, declaration, conversation, or writing which is necessary to make it understood may also be given in evidence."

20

on a showing that the court exercised its discretion in an arbitrary, capricious or patently absurd manner that resulted in a manifest miscarriage of justice." ' " (*People v. Nguyen* (2010) 184 Cal.App.4th 1096, 1116.)  We find no abuse of discretion.  First, K.H. testified that she knew little about the dog issue because it was before she became involved with Smith.  Second, any information she had was based on hearsay, and possibly even hearsay within hearsay.[13]  Third, any further information regarding the "dog-debt" was not relevant to the issues in the trial.  K.H. witnessed an argument between Smith and S.W. during which S.W. was angry because Smith "wouldn't give [S.W.] the money for the dog or something" and she threatened Smith.  The details about an imprisoned third party's possible connection to the alleged "dog-debt" had no bearing on the defendants' guilt or innocence.

Pratt argues the evidence was necessary to make it "clear that he was not the amorous interest to whom the dog-debt was owed," but K.H. never testified that the money for the dog was owed to Pratt or to any boyfriend of S.W.'s.  Although Pratt's counsel solicited testimony from K.H. that S.W. wanted money "for somebody else," the prosecutor objected to this testimony and it was stricken.

The purpose of section 356 is " ' "to prevent the use of selected aspects of a conversation . . . so as to create a misleading impression on the subjects addressed." ' " (*People v. Hardy* (2018) 5 Cal.5th 56, 104.)  Here, K.H.'s testimony regarding the threat did not leave the jury with any misleading impression regarding the dog debt, and additional testimony was not necessary to understand the threat made by S.W.  The only relevant issue

---

[13] In K.H.'s police interviews, she stated Smith told her that S.W.'s boyfriend, who was in prison, gave him the dog.  K.H. also stated that S.W. referred to her "boyfriend[] . . . in [the] feds," who gave Smith the dog.

was whether S.W. made a statement that Smith would be "tasting bullets." The trial court did not abuse its discretion by excluding hearsay testimony on a matter about which K.H. had no direct knowledge. (See *People v. Riccardi* (2012) 54 Cal.4th 758, 803 [under Evid. Code, § 356 entirety of conversation is admissible "if necessary to the understanding of the otherwise admissible portions"], overruled on other grounds in *People v. Rangel* (2016) 62 Cal.4th 1192, 1216.)

The defendants also argue the exclusion of evidence violated their constitutional rights to confront witnesses, to present evidence on their behalf, and to a fair trial. (U.S. Const., 5th, 6th & 14th Amends.; Cal. Const., art. I, §§ 7 & 15.) " 'As a general matter, the ordinary rules of evidence do not impermissibly infringe on the accused's [constitutional] right to present a defense." (*People v. Cudjo* (1993) 6 Cal.4th 585, 611.) Here, the trial court did not err in excluding hearsay testimony and there was no constitutional violation.

Even if we were to assume the trial court erred, we would find any error harmless. At most, the testimony sought by the defendants might have revealed that it was S.W.'s incarcerated ex-boyfriend, rather than S.W. herself, who was owed money for the dog. Such evidence would not undercut K.H.'s testimony about S.W.'s threat, her eyewitness testimony regarding the shooting, her in court identification of the defendants, the surveillance video, and the phone records showing coordination between S.W. and Pratt before and after the murder. We find that even if there was error, it is not reasonably probable that a result more favorable to the defendants would have been reached in the absence of any assumed error. (See *People v. Cunningham* (2001) 25 Cal.4th 926, 999 ["the exclusion of defense evidence on a minor or subsidiary point does not interfere with [a] constitutional right.

[Citation.] Accordingly such a ruling, if erroneous, is 'an error of law merely,' which is governed by the standard of review announced in *People v. Watson* (1956) 46 Cal.2d 818, 836"].)

## V.   *Ballard Forfeited Dueñas Claim*

At Ballard's sentencing hearing on August 28, 2018, the trial court imposed the following fines, fees, and assessments:  $300 restitution fine (Pen. Code, § 1202.4, subd. (b)); $300 parole revocation restitution fine (Pen. Code, § 1202.45), suspended unless parole is revoked; $120 court operations assessment (Pen. Code, § 1465.8) ($40 per convicted count); $90 criminal conviction assessment (Gov. Code, § 70373) ($30 per convicted count); and a $135 booking fee (Gov. Code, § 29550.2).

For the first time on appeal, Ballard argues in supplemental briefing that under *People v. Dueñas* (2019) 30 Cal.App.5th 1157 (*Dueñas*) remand is required because the trial court failed to determine Ballard's ability to pay before imposing the fines, fees, and assessments.[14]  We conclude that Ballard forfeited this argument.

Ballard concedes his trial counsel did not object to the imposition of any of the fines, fees, or assessments on the basis of an inability to pay.  A timely objection below was required to preserve this claim.  (See *People v. Frandsen* (2019) 33 Cal.App.5th 1126, 1153 (*Frandsen*) [concluding that the defendant forfeited challenge where his trial counsel failed to object to assessments or restitution fine at sentencing]; *People v. Trujillo* (2015) 60 Cal.4th 850, 859

---

[14] *Dueñas* held that due process of law requires an ability to pay hearing and a determination of present ability to pay before a court imposes assessments under Penal Code section 1465.8 and Government Code section 70373, or executes a restitution fine under Penal Code section 1202.4. (*Dueñas, supra*, 30 Cal.App.5th at p. 1164.)

[explaining that constitutional nature of defendant's claim regarding his ability to pay did not justify a deviation from the forfeiture rule].)

Ballard fails to show an applicable exception to the doctrine of forfeiture. We disagree with Ballard's argument that *Dueñas* was an unforeseen change in the law. As explained in *Frandsen*, "*Dueñas* was foreseeable. Dueñas herself foresaw it. The *Dueñas* opinion applied 'the *Griffin–Antazo–Bearden* analysis,' " flowing from cases *Griffin v. Illinois* (1956) 351 U.S. 12, *In re Antazo* (1970) 3 Cal.3d 100, and *Bearden v. Georgia* (1983) 461 U.S. 660. (*Frandsen, supra*, 33 Cal.App.5th at p. 1154, quoting *Dueñas, supra*, 30 Cal.App.5th at p. 1168.) *Dueñas* likewise observed, " 'The principle that a punitive award must be considered in light of the defendant's financial condition is ancient.' " (*Dueñas*, at p. 1171.) Accordingly, "*Dueñas* applied law that was old, not new." (*Frandsen*, at p. 1155.)

Ballard also fails to persuade us that his trial counsel's failure to object constitutes ineffective assistance of counsel. The test for ineffective assistance of counsel requires a criminal defendant to establish both that his or her counsel's performance was deficient and that he or she suffered prejudice. (*Strickland v. Washington* (1984) 466 U.S. 668, 687.) "Judicial scrutiny of counsel's performance must be highly deferential." (*Id.* at p. 689.) Ballard's conclusory statement that his counsel's "failure to object constitutes ineffective assistance of counsel," without more, is insufficient to establish ineffective assistance of counsel.

Even assuming no forfeiture, we would conclude any error under *Dueñas*[15] was harmless beyond a reasonable doubt. (*People v. Johnson* (2019)

---

[15] Courts have strongly criticized the substantive holding in *Dueñas*. (See, e.g., *People v. Hicks* (2019) 40 Cal.App.5th 320, 326–329, review granted Nov. 26, 2019, S258946.) We need not offer our opinion regarding the *Dueñas*

24

35 Cal.App.5th 134, 139–140.) A defendant's ability to pay is not limited to his or her present financial situation but can also be based on his or her future ability to earn prison wages and money after release from custody. (*People v. Hennessey* (1995) 37 Cal.App.4th 1830, 1837.) Here, the record shows that Ballard was 30 years old at the time of sentencing and that he will be serving a prison term of 50 years to life. The total amount of the challenged fines, fees, and assessments is $635 (the $300 parole revocation fine is suspended). Nothing in this record indicates Ballard will be unable to work or ineligible for prison work assignments. Even assuming Ballard had no available assets at the time of sentencing, he will have ample time to pay the $635 assessed against him from his prison wages. (*Johnson*, at pp. 139–140.)

## VI. *Remand for resentencing on firearm enhancement is not required.*

In addition to the murder and conspiracy charges, the amended information also alleged that Ballard personally discharged a firearm in the commission of murder. (§ 12022.53, subd. (d).) The jury found the enhancement to be true.

At Ballard's sentencing hearing on August 28, 2018, he asked the trial court to exercise its discretion under section 12022.53, subdivision (h) to strike the subdivision (d) firearm enhancement. The trial court denied the request and imposed a sentence of 25 years to life for the firearm

---

holding because we conclude that, on this record, any possible error (even if not forfeited) was harmless beyond a reasonable doubt.

enhancement under subdivision (d), consecutive to 25 years to life for the first degree murder count.[16]

In supplemental briefing, Ballard requests remand for the trial court to consider whether to exercise its discretion to strike the section 12022.53, subdivision (d) firearm enhancement and impose a lesser, uncharged firearm enhancement under subdivision (b) or (c). He argues that under the authority of *People v. Morrison* (2019) 34 Cal.App.5th 217 (*Morrison*), which was decided after Ballard's sentencing hearing, the trial court's discretion to strike a subdivision (d) enhancement is not limited to "an all or nothing choice." Rather, the trial court may strike the greater subdivision (d) enhancement and instead impose an uncharged enhancement pursuant to subdivision (b) (10 years) or subdivision (c) (20 years).[17] Ballard argues that based on the lack of any discussion by either the parties or the trial court regarding the possibility of imposing a lesser enhancement, the trial court was unaware that the scope of its discretionary power included the ability to impose a lesser enhancement under subdivision (b) or (c) as a middle ground.

In *Morrison*, our colleagues in Division Five held that a court's discretion under section 12022.53, subdivision (h) to " 'strike or dismiss' " a firearm allegation in the interests of justice includes the authority to impose a lesser included, uncharged enhancement "as a middle ground to a lifetime

---

[16] Ballard was also sentenced to 25 years to life on the conspiracy count and to three years for being a felon in possession of a firearm, but these sentences were stayed pursuant to section 654.

[17] Section 12022.53 provides three firearm enhancements: a 25-years-to-life enhancement for "personally and intentionally discharg[ing] a firearm and proximately caus[ing] great bodily injury," a 20-year enhancement for "personally and intentionally discharg[ing] a firearm," and a 10-year enhancement for "personally us[ing] a firearm." (§ 12022.53, subds. (b), (c), (d).)

enhancement under section 12022.53, subdivision (d), if such an outcome [is] . . . in the interests of justice under section 1385." (*Morrison, supra*, 34 Cal.App.5th at p. 223.)

Multiple courts have disagreed with *Morrison*, and our Supreme Court has granted review to resolve the split in authority. (See, e.g., *People v. Tirado* (2019) 38 Cal.App.5th 637, review granted Nov. 13, 2019, S257658; *People v. Garcia* (2020) 46 Cal.App.5th 786, review granted June 10, 2020, S261772; *People v. Yanez* (2020) 44 Cal.App.5th 452, review granted Apr. 22, 2020, S260819.) Most recently, our colleagues in Division One agreed with the *Tirado* line of cases and found that section 12022.53, subdivision (h) does not give the trial court power to strike a legally and factually supported enhancement found true and impose a lesser enhancement that was not found true. (*People v. Delavega* (2021) 59 Cal.App.5th 1074, 1094 (*Delavega*).)

The People assert Ballard forfeited this claim because at the time of sentencing he did not request that the trial court impose one of the lesser, uncharged firearm enhancements. Ballard replies that there can be no forfeiture because there is no indication the trial court was aware it had discretion to impose a lesser firearm enhancement. Here, as in *Morrison*, "[a]t the time of [sentencing], no published case had held an uncharged lesser firearm enhancement could be imposed in lieu of an enhancement under section 12022.53, subdivision (d) in connection with striking the greater enhancement." (*Morrison, supra*, 34 Cal.App.5th at p. 224.) *Morrison* does not state whether the People there argued forfeiture, but the opinion suggests its decision should be considered an unforeseen change in the law and that a failure to object in the trial court may be excused. (*Ibid.*)

But even if we assume no forfeiture, we still deny Ballard's request for resentencing because we agree with the *Delavega* decision and find that the

27

trial court's power to strike a firearm enhancement under section 12022.53, subdivision (h) does not include the power to impose a lesser enhancement that was not found true. (*Delavega, supra*, 59 Cal.App.5th at p. 1094.) *Morrison* based its decision on case law recognizing that a court may impose a " 'lesser included' " enhancement that was not charged in the information when a greater enhancement found true is either legally inapplicable or unsupported by sufficient evidence. (*Morrison, supra*, 34 Cal.App.5th at p. 222, citing *People v. Fialho* (2014) 229 Cal.App.4th 1389, 1395–1396 [enhancement for personal use of a firearm under § 12022.5, subd. (a) was authorized although not charged when defendant was convicted of voluntary manslaughter as a lesser included offense of murder, to which § 12022.53, which was found true by the jury, does not apply].) *Morrison* concluded, "Under these cases, the court could impose an uncharged enhancement under section 12022.53, subdivision (b) or (c) in lieu of an enhancement under section 12022.53, subdivision (d) if it was unsupported by substantial evidence or was defective or legally inapplicable in some other respect. We see no reason a court could not also impose one of these enhancements after striking an enhancement under section 12022.53, subdivision (d), under section 1385." (*Morrison*, at p. 222.)

As *Delavega* explains, "there *is* a reason why the power to impose an uncharged lesser enhancement exists when a greater enhancement is contrary to the law or evidence but not in other contexts. The reason is that a court's power to modify a verdict or judgment emanates from legislation, not from any inherent authority. Two statutes—sections 1811 and 1260[18]—

---

18 Section 1181, subdivision 7 states, "When the verdict or finding is contrary to law or evidence, . . . the court may modify such verdict or finding by imposing the lesser punishment without granting or ordering a new trial, and this power shall extend to any court to which the case may be appealed."

confer on courts the power to modify a greater enhancement to an uncharged lesser enhancement when the greater enhancement is not supported by law or evidence, but no statute confers a similar power when the greater enhancement is supported by the law and evidence but is stricken in the interest of justice." (*Delavega, supra*, 59 Cal.App.5th 1090–1091.) Where, as here, the greater, charged enhancement was found true and is legally and factually supported, "a trial court does not have authority under section 12022.53(h) or otherwise, to strike a greater firearm enhancement that is legally and factually sound and impose a lesser one that was neither charged nor found by the jury. Rather, a trial court's general power to reduce an enhancement is statutorily limited to instances when the enhancement 'is contrary to law or evidence' under section 1181, subdivision (7), and section 12022.53(h) does not expand that power. Thus, if a trial court strikes an otherwise legally and factually supported enhancement 'in the interest of justice pursuant to Section 1385' (§ 12022.53(h)), it lacks the power to impose a lesser enhancement that was not charged or found by the jury." (*Id.* at p. 1094.)

Here, there is no suggestion that the greater enhancement found true by the jury was either legally inapplicable or unsupported by sufficient evidence. Instead, the evidence fully supports the jury's finding that Ballard personally discharged a firearm in the commission of the murder. (§ 12022.53, subd. (d).) The evidence includes surveillance video from which

---

Section 1260 applies to appellate courts and states, "The court may reverse, affirm, or modify a judgment or order appealed from, or reduce the degree of the offense or attempted offense or the punishment imposed, and may set aside, affirm, or modify any or all of the proceedings subsequent to, or dependent upon, such judgment or order, and may, if proper, order a new trial and may, if proper, remand the cause to the trial court for such further proceedings as may be just under the circumstances."

Assistant Chief of Police Toney Chaplin identified Ballard based upon Chaplin's prior contact with Ballard. The surveillance video shows Ballard on Sixth Street, shortly before the shooting, going into a convenience store with Pratt around 10:30 p.m. and then standing on the street with Pratt and S.W. at 10:48 p.m. Then, Ballard is seen again going into the convenience store and adjusting something in his waistband before walking down Sixth Street and shooting the victim in the head at close range. Further, K.H. provided eyewitness testimony of the shooting and identified Ballard as the shooter.

Under section 12022.53, subdivision (h), the trial court had authority "to strike or dismiss [the] enhancement," in the interests of justice, and it opted not to strike or dismiss the enhancement. It did not have the discretionary power to impose a lesser firearm enhancement in place of the greater enhancement where the greater enhancement found true was legally and factually supported. (*Delavega, supra*, 59 Cal.App.5th at p. 1094.) Accordingly, remand for resentencing is not required.

## DISPOSITION

The judgments are affirmed.

_____

Jackson, J.


WE CONCUR:



_____

Petrou, Acting P. J.



_____

Wiseman, J.*

A154907/*People v. Anthony Pratt*
A155287/*People v. Trumillion Ballard*

_____

      * Retired Associate Justice of the Court of Appeal, Fifth Appellate District, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.