Filed 6/9/23 P. v. Lampe CA4/2

## NOT TO BE PUBLISHED IN OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b). This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

## IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## FOURTH APPELLATE DISTRICT

## DIVISION TWO

| | |
|---|---|
| THE PEOPLE,<br><br>Plaintiff and Respondent,<br><br>v.<br><br>TRACEY CHARLES LAMPE et al.,<br><br>Defendants and Appellants. | E070676<br><br>(Super.Ct.No. FVI1102893)<br><br>OPINION |

APPEAL from the Superior Court of San Bernardino County. Bryan K. Stodghill, Judge. Affirmed as to Ashley Gilroy; affirmed in part, reversed in part with directions as to Tracey Charles Lampe.

Nancy Olsen and Jason L. Jones, under appointment by the Court of Appeal, for Defendant and Appellant, Tracy Charles Lampe.

Michael Bacall, under appointment by the Court of Appeal, for Defendant and Appellant, Ashley Gilroy.

Rob Bonta, Attorney General, Lance E. Winters, Chief Assistant Attorney General, Charles C. Ragland , Assistant Attorney General, Melissa Mandel and Tami Falkenstein Hennick, Deputy Attorneys General, for Plaintiff and Respondent.

As part of a plan to rob their drug dealer, defendants Tracey Charles Lampe and Ashley Gilroy decided to murder Gilroy's ex-boyfriend, Keith Wimberley, when Wimberley, instead of the drug dealer, showed up at Lampe's house to deliver drugs. When they learned Wimberley hadn't arrived alone, they kidnapped the woman he came with, Sarah N., and debated whether to kill her as well. Gilroy, who wanted Sarah dead, left Lampe to deal with her along with the cleanup needed after Wimberley's death. Hours later, after Lampe and Gilroy's current boyfriend, Francisco Mora, had disposed of Wimberley's body, Lampe let Sarah go.

At trial, Sarah and Mora testified for the prosecution. The jury convicted Lampe of murder, kidnapping, and assault, and convicted Gilroy of murder, kidnapping, and dissuading a witness. They also found gun enhancement allegations true for each offense. Lampe received a total sentence of 70 years, 4 months to life, and Gilroy received 45 years, 4 months to life.

On appeal, defendants raise several challenges to their convictions, only one of which we find meritorious. Lampe argues: (1) the trial judge erred in admitting Gilroy's hearsay statements to Mora as declarations against her penal interest; (2) the judge also erred in admitting prejudicial cell phone, character, and custody status evidence; (3) the

punishment for his assault conviction should have been stayed under Penal Code[1] section 654; (4) the cumulative effect of the evidentiary errors violated his due process right to a fair trial; and (5) recent changes in the law require us to strike certain fees and remand for resentencing on his kidnapping conviction.

Gilroy argues the recent amendment to the felony-murder rule enacted while her appeal was pending requires us to reverse her murder conviction. Specifically, she argues the jury instruction on felony murder omitted key elements of the newly redefined offense and the omission was not harmless beyond a reasonable doubt. Gilroy also contends Mora's accomplice testimony was not sufficiently corroborated and her punishment for dissuading a witness should have been stayed under section 654.

We agree that Lampe is entitled to resentencing on his kidnapping conviction and that the challenged fees are now invalid, but we reject defendants' remaining claims. We therefore remand to the trial court for that limited purpose, but in all other respects, affirm the judgment.

# I

## FACTS

A. *Sarah's Testimony*

Sarah and Wimberley were dating at the time of the incident and were grocery shopping on the night of December 22, 2011, when Wimberley received a call from a woman Sarah didn't know but later learned was Gilroy. When Wimberley got off the

---

[1] Unlabeled statutory citations refer to the Penal Code.

phone, he told Sarah they had to leave right away because he needed to make an estimate on someone's car (Wimberley was a mechanic). He drove in a hurry to Lampe's home where Gilroy was standing in the driveway waiting for him when they arrived. Wimberley got out to talk to Gilroy while Sarah waited in the truck. Gilroy led Wimberley into the garage and immediately closed the garage door behind them. Sarah rolled down the window and heard the muffled sounds of two men arguing inside the garage. Then she heard Wimberley say, "Fuck, why?" followed by two gunshots.

Moments later, Lampe came out of the house with a shotgun, pointed it at her, and ordered her out of the truck. Terrified, she fumbled with the seatbelt before getting out, and when Lampe pressed the barrel of the gun against her lower back, she urinated on herself. Lampe then forced her, at gun point, through the house and into the garage. He told her it was "unfortunate" she was there because she wasn't "the target."

As soon as they entered the garage, Gilroy ran up to Sarah, hysterical, and asked her how long she'd known Wimberley and if she knew he was a "baby raper." Lampe told both women to be quiet and made Sarah stand against the wall and face a van that was parked to one side. He told her not to look behind the van.

Lampe handed the shotgun to Gilroy who pointed it at Sarah. Lampe retrieved another, smaller gun from the top of the refrigerator, gave that gun to Gilroy, and took back the shotgun. With the gun pointed at Sarah, Gilroy told her that if she said anything to anybody, or made any noise, she would "find [her] kids and skin them alive."

4

Lampe and Gilroy then busied themselves behind the van, periodically coming back one at a time to check on her. She heard them mention that Wimberley had been killed because he was a "baby raper." At some point, Lampe and Gilroy decided they needed to take Gilroy somewhere and Sarah had to come with them. Ordering her not to do anything stupid, Lampe and Gilroy forced her back to the truck. They made her wear her jacket hood over her face and keep her eyes on the floor so she wouldn't see where they were going.

Lampe drove to the trailer where Gilroy's boyfriend, Mora, lived. Before getting out, Gilroy searched the truck for a laptop she claimed had been hers but didn't find anything. Lampe then drove back to his house and made Sarah sit in a chair in the back of the garage. He started to smoke methamphetamine and offered it to her. Hoping it would increase her chances of survival, Sarah smoked with Lampe and tried to strike up a conversation. At one point, Lampe thought he caught her looking around the garage and hit her across the face with his gun. She pleaded with him not to kill her and he said he wouldn't if "everything work[ed] out."

Gilroy phoned Lampe and Sarah could hear her on the other end asking repeatedly if Lampe had killed her yet. She also heard them discussing how to dispose of Wimberley's body. Lampe said it was too heavy for him to lift on his own and told Gilroy to get her friend or brother to help.

Afraid that anyone else who became involved would also try to convince Lampe to kill her, Sarah offered to help dispose of the body. She told Lampe if he made her an accomplice he wouldn't have to worry about her telling anyone what had happened. Lampe took her up on the offer but Wimberley's body proved too heavy for their combined effort, so he forced her back into the truck so they could get help.

On the way, Lampe stopped to get gas and forced Sarah to accompany him inside the station and "[a]ct like [they were] a loving couple" or else he'd cut her with his knife. Lampe drove back to Mora's trailer. When Mora came outside and saw Sarah, Lampe said he wasn't going to kill her and that Mora could turn around if he had a problem with that arrangement. Mora indicated he didn't care and the three of them went back to Lampe's house.

Lampe and Mora made Sarah sit in the back of the garage facing the wall with her hood over her head while they loaded Wimberley's body in the truck and cleaned the garage. Before heading out again, Mora lifted Sarah up by her hair and shined a bright light in her face. He asked who she was affiliated with, where she lived, where her mom lived, and whether she knew any of Wimberley's associates, specifically, a person named Junior. Sarah said she knew Junior had been Wimberley's best friend but didn't know him well. Mora threatened to hurt Sarah's family if she squealed on them.

The men ordered Sarah to keep her head down and covered. They drove for what "seemed like forever" until they reached a bumpy off-road area where Lampe and Mora dumped Wimberley's body. Lampe drove around for a while, then pulled into a fast food

6

parking lot and told Sarah he might let her go. When she responded, "Yes that's great," he hit her in the face and said, "Don't take my kindness for weakness, bitch, . . . I will stab you." He drove around some more before finally letting Sarah out on the side of the road.

Sarah flagged down another car and got a ride to a restaurant where she used someone else's phone to call her mother. In the early morning hours of December 23, a deputy from the San Bernardino County Sheriff's Department arrived and took her to the station for interviews.

B.    *Mora's Testimony*

After being charged with accessory to murder, kidnapping, dissuading a witness, and criminal threats, Mora entered a plea deal with the prosecution and received a 10-year prison sentence in exchange for pleading guilty to being an accessory after the fact, admitting a prior strike, and agreeing to testify against Lampe and Mora. At trial, the judge found Mora was an accomplice as a matter of law and instructed the jury to view his testimony with distrust unless they determined it was corroborated by other evidence.

Mora said he started dating Gilroy about two weeks before the incident and was letting her stay with him in his trailer in Hesperia. He said Lampe and Gilroy had previously dated and were raising Gilroy's young daughter together despite having what he described as a stormy relationship. A week before the incident, Gilroy had Mora take her to Lampe's house to give him a shotgun she'd recently acquired.

7

The night of Wimberley's murder, Gilroy asked Mora to take her to Lampe's house, saying they needed money and had to "take care of something." About an hour after he'd dropped her off, Gilroy started sending him a series of "frantic" texts, and when he returned home later that evening, Gilroy was already there. She had half an ounce of methamphetamine and told him she and Lampe had just robbed somebody.

Mora told Gilroy he didn't want to hear about it, but at some point Lampe showed up at his trailer asking for his help moving a dead body. Lampe was in a truck Mora didn't recognize and had a hooded passenger in the front seat. Mora told Lampe he didn't want to get involved because he already had strikes on his record, but Lampe said he had no other options and made a thinly veiled threat.

Mora said Lampe's garage was a "big mess." Wimberley's body was lying on the floor and there was blood everywhere. Lampe told Mora he didn't like Wimberley because he'd mistreated Gilroy and "raped a baby." Mora helped Lampe put Wimberley's body in the back of the truck and clean the garage, then they all headed out to find a place to dump the body.

After some driving around, Lampe found a remote area and Mora helped him pull Wimberley's body off the truck bed. After that, Lampe drove to a residential area and let Sarah go. He then drove to a retail parking lot where they abandoned the truck and walked to the home of two women Lampe knew who gave them a ride to Lampe's house in exchange for drugs. During the drive, Mora could hear Lampe and Gilroy arguing over the phone about why he'd let Sarah go. Lampe handed Mora the phone, and Gilroy told

8

him, "You need to find her and you need to kill her." Mora refused to be a part of it and handed the phone back to Lampe.

After they arrived at Lampe's house, Lampe took Mora home where Gilroy was waiting, angry they'd let Sarah live. Gilroy proceeded to tell Mora about what had happened earlier in the evening. She said Wimberley had not been their initial target. She and Lampe had originally planned to rob their drug dealer, Junior, but were happy when Wimberley arrived instead because it gave them a chance to "get back at" Wimberley for the things he'd done to her. She said Wimberley had once forced her to leave his house and walk a long distance with her daughter who was just a baby and had also refused to return several of her belongings, including her laptop.

Gilroy recounted how she'd led Wimberley into the garage where Lampe was crouched in front of the van, waiting for him with a shotgun, and how, when Wimberley had tried to run, she stabbed him and pushed him toward Lampe. She said Lampe had missed on his first shot but fired a second one that hit the back of Wimberley's head, killing him instantly. She said she had wanted to kill the woman Wimberley came with but Lampe wouldn't allow it.

Gilroy took two rings from her purse and told Mora she'd stolen them from Wimberley in addition to the drugs. The rings were gold and one contained a small diamond.

Mora said Lampe had relayed to him a similar version of the incident when he was helping Lampe dispose of the body, including the detail that he'd been crouched in front of the van waiting with the shotgun when Wimberley entered the garage.

Asked why he hadn't mentioned Gilroy's statements to him during his first police interview, Mora said he'd initially lied to protect Gilroy because he cared about her and her daughter. In 2016, he changed his mind and agreed to talk to law enforcement about her involvement in Wimberley's murder.

C.    *Other Inculpatory Evidence*

The prosecution produced a series of text messages Lampe and Gilroy sent to each other on the afternoon of the incident. About 3:50 p.m. on December 22, 2011, Gilroy texted Lampe that she had "to set it back up because [I was] supposed to meet him an hour ago." Lampe asked, "are you trying for today?" and Gilroy replied, "Yes. I'm trying for tonight . . . ." Later, Gilroy texted Lampe, "I'm going to set up a meet with Junior." She asked Lampe whether he was going to "bring both guns and get me or should we do it at your house?" then added, "I got a ride to you if that's what you want. I can have Robert drop me off there when he takes [Mora] to the store. Would that be better?" Gilroy sent another text saying, "I'm going to have Junior meet me there at your pad with a half-ounce or a whole ounce, yeah or no," to which Lampe replied, "You want to be quiet. My mom is still up, k." and Gilroy responded, "K. I'm on my way."

The day after the murder, December 23, 2011, police arrested Gilroy and Mora at Mora's home. Inside Gilroy's purse they found two rings, one of which contained a clear stone. A deputy who was surveilling Lampe's home saw Lampe and his mother in the garage wiping down the side of a van. When Lampe was arrested later that day, there was blood spatter on his shoes and the motorcycle he was driving.

Law enforcement discovered Wimberley's body in a remote area in Victorville. Wimberley had a stab wound in his chest, blunt force trauma to his face and head, and a shotgun wound in the back of his head. There were no injuries on his hands or other areas that would indicate there had been a struggle.

D.   *Lampe's Testimony*

Gilroy did not take the stand, but Lampe testified in his own defense. He denied he and Gilroy had been planning to rob anyone that day. He admitted he shot Wimberley but claimed he'd done so accidentally as they were struggling over his shotgun.

According to Lampe, Gilroy had arrived at his house unexpectedly that evening, asking for money to buy Christmas presents. He told her he didn't have any money and waited with her in his garage for someone to pick her up. At one point, he went inside his house and when he returned to the garage Gilroy told him her ride had arrived. That's when Lampe noticed Wimberley (whom he knew casually but not well) standing by his workbench. Wimberley loaded Lampe's shotgun with two shells and told Lampe he was going to take the gun to satisfy a debt Gilroy owed him.

11

Lampe tried to get his gun back, and as they struggled over it, Wimberley accidentally fired a shot into the ceiling. Scared for his life, Lampe grabbed a knife from his workbench and stabbed Wimberley in his torso. He grabbed the gun from Wimberley and used it to strike him in the back of his head and his face. As Wimberley was facing Lampe and doubled over from the blows, Lampe accidentally pulled the trigger. The shot hit Wimberley and killed him. Asked what Gilroy was doing during the struggle, Lampe said he wasn't "sure exactly"; he thought she might have gone inside to use the restroom and had come back when she heard the gunshots.

E.     *Verdict and Sentencing*

On March 8, 2018, the jury found Lampe guilty of: (1) first degree murder with an enhancement for personally and intentionally discharging a firearm causing death (§§ 187, subd. (a), 12022.53, subd. (d)); (2) kidnapping with a personal use firearm enhancement (§§ 207, subd. (a), 12022.53, subd. (b)); and (3) assault with a firearm with a firearm use enhancement (§§ 245, subd. (a)(2), 12022.5, subd. (a) & (d)). They found Gilroy guilty of: (1) first degree murder with an enhancement for a principal being armed with a firearm (§§ 187, subd. (a), 12022, subd. (a)(1)); (2) kidnapping with a personal use firearm enhancement (§§ 207, subd. (a), 12022.53, subd. (b)); and (3) dissuading a witness by force or threat with a firearm use enhancement (§§ 136.1, subd. (c)(1), 12022.5, subd. (a)).

12

In June 2018, San Bernardino County Superior Court Judge Bryan Stodghill sentenced Lampe to a total sentence of 20 years, 4 months plus 50 years to life, comprised of: 25 years to life for the murder plus 25 years to life for the firearm enhancement plus 1 year (stayed) for the arming enhancement; 8 years for the kidnapping plus 10 years for the enhancement; 1 year for the assault with an additional 1 year 4 months for the enhancement. As for Gilroy, the judge imposed a total sentence of 20 years, 4 months plus 25 years to life, comprised of: 25 years to life for the murder[2]; 8 years for the kidnapping plus 10 years for the enhancement; 1 year for the dissuading plus 1 year, 4 months for the enhancement.

Defendants filed a timely appeal.[3]

## II

## ANALYSIS

### A.   *Gilroy's Hearsay Statements*

Lampe argues the judge erred by allowing Mora to testify about what Gilroy said to him the night of the murder because Gilroy's statements were hearsay. We conclude the judge properly determined Gilroy's statements were admissible as statements against her penal interest under Evidence Code section 1230.

---

[2] At sentencing, the parties agreed to strike the firearm enhancement because they were unable to locate the verdict form for it.

[3] The appeal experienced several delays arising from a lengthy stay pending a section 1172.6 petition Gilroy had filed to vacate her murder conviction, as well as various extension requests.

13

We review evidentiary rulings for abuse of discretion. (*People v. Lawley* (2002) 27 Cal.4th 102, 115, 153.) "Although hearsay statements are generally inadmissible under California law (Evid. Code, § 1200, subd. (b)), the rule has a number of exceptions." (*People v. Grimes* (2016) 1 Cal.5th 698, 710 (*Grimes*).) The exception at issue here applies to statements that tend to subject the speaker to the risk of civil or criminal liability such that a "reasonable" person in the speaker's position "would not have made the statement unless [they] believed it to be true." (Evid. Code, § 1230.)

A declaration against penal interest may be admitted in its entirety—even if portions of the statement implicate a nontestifying defendant—as long as the statement is not "'exculpatory, self-serving, or collateral'" and the portion incriminating the defendant is "'inextricably tied to and part of a specific statement against penal interest.'" (*Grimes*, *supra*, 1 Cal.5th at p. 715; *People v. Samuels* (2005) 36 Cal.4th 96, 120-121.) Statements implicating both the declarant and a codefendant are trustworthy when "made under circumstances that . . . suggest reliability . . . such as statements made to a personal acquaintance in a noninvestigatory context where the setting suggests no motive to speak falsely" or to "shift blame or curry favor." (*People v. Greenberger* (1997) 58 Cal.App.4th 298, 334 (*Greenberger*).)

Gilroy's statements to Mora fall squarely within this exception. She incriminated herself in a murder that had just occurred while talking to her boyfriend under circumstances she felt were safe. To support his claim of error, Lampe argues the parts of

14

Gilroy's story that implicated him shouldn't have been admitted because they were "collateral" and "blame shifting." We disagree.

There's a significant difference between blame shifting and describing a crime committed in concert, and in this case Gilroy was clearly doing the latter. In her version of the events, she and Lampe worked together to kill Wimberley. She painted herself just as culpable as Lampe. Nor were her statements about Lampe "collateral" to those about her own involvement in the murder. Because they planned and committed the murder together, her description of Lampe's involvement is central to the crime and to the statements incriminating her.

Lampe's reliance on *People v. Gallardo* (2017) 18 Cal.App.5th 51 and *People v. Duarte* (2000) 24 Cal.4th 603 is misplaced. Those cases are easily distinguishable by the fact the declarants were already under arrest and being investigated for the crimes when they made statements implicating their codefendants. As the court explained in *Greenberger*, "the least reliable circumstance" for making statements that shift blame to others is when a person is already under investigation for a crime. "The most reliable circumstance," on the other hand, is the one at play here, "in which the conversation occurs between friends in a noncoercive setting that fosters uninhibited disclosures." (*Greenberger*, *supra*, 58 Cal.App.4th at p. 335.) Because Gilroy talked to Mora shortly after the murder and before she knew she was being investigated for Wimberley's murder, the judge could correctly view her statements as reliable.

For all of these reasons, we conclude the trial judge properly admitted Gilroy's statements.

B.      *Admission of Cell Phone, Character, and Custody Status Evidence*

Lampe argues the trial judge erroneously allowed the jury to hear three types of inflammatory evidence and the cumulative effect of these three errors requires reversal. We disagree. Even if he could demonstrate the evidence was admitted in error, he cannot demonstrate prejudice.

1.      *Additional facts*

Among the text messages the prosecution showed the jury was one sent to Lampe from an unknown third party mentioning they had just scored a "big trash bag full of weed." The jury also saw messages between Lampe and Gilroy on the day of the murder in which they called each other names and argued about who had used Lampe's "dope." In this exchange, Lampe called Gilroy a "two faced dirty bitch," and a "fake ass bitch," and she called him a "piece of shit" and "the most cruelest motherfucker I ever met."

During Mora's testimony, he mentioned he hadn't told Lampe he was dating Gilroy because of Lampe's reputation for violence, saying, "he's kind of a violent dude, from what I heard." At defense counsel's objection, the judge struck the testimony and told the jury not to consider it.

Mora also mentioned during his testimony that Lampe had recounted some of the details of Wimberley's death when they were "housed in the same unit." Defense counsel immediately moved for a mistrial, arguing the reference to Lampe's custody status was

16

overly prejudicial. The judge denied the motion, noting the jury had already heard evidence that Lampe had been arrested and taken into custody for the offenses, but cautioned the prosecutor not to elicit any more testimony about Lampe's incarceration.

Lampe argues the combination of this cell phone, character, and custody evidence was overly prejudicial to him and resulted in an unfair trial.

        2. *Analysis*

Evidence that has "any tendency in reason to prove or disprove" a disputed fact is relevant, and in general, all relevant evidence is admissible. (Evid. Code, §§ 210, 351.) Evidence Code section 352 permits a judge to exclude relevant evidence, however, if its probative value is substantially outweighed by its tendency to prejudice the defendant. Evidence is prejudicial if it is inflammatory or likely to confuse the jury and distract from the real issues on trial. (E.g., *People v. Jennings* (2000) 81 Cal.App.4th 1301, 1314.) Trial judges have broad discretion to determine relevancy and prejudice, and we will not find error unless their rulings are shown to be arbitrary or irrational. (Evid. Code, § 351; *People v. Carter* (2005) 36 Cal.4th 1114, 1166; *People v. Jablonski* (2006) 37 Cal.4th 774, 805.) Evidentiary errors require reversal only when it is "reasonably probable" they affected the outcome of trial. (*People v. Watson* (1956) 46 Cal.2d 818, 835; see also *People v. Ayala* (2000) 23 Cal.4th 225, 271 [*Watson* harmless error standard applies to challenges under Evid. Code, § 352].)

It is this final requirement Lampe cannot satisfy. To begin with, the judge admonished the jury not to consider Mora's comment about Lampe's violent reputation, and we assume they followed that instruction. (*People v. Krebs* (2019) 8 Cal.5th 265, 335.) As for Mora's brief reference to the fact he'd been in custody with Lampe, the comment was harmless because the jury had already learned they'd both been arrested for Wimberley's murder. And finally, we find Lampe's concern over a few scattered references to his marijuana habit and propensity to curse unfounded when we compare that evidence to the particularly strong evidence about the nature of the crimes he committed. As a result, we conclude there is no possibility the character evidence affected the outcome of trial. (*People v.* Watson, *supra*, 46 Cal.2d at p. 835.)

C.      *Section 654 and Lampe's Kidnapping and Assault Convictions*

Lampe argues the judge should have stayed the punishment on his assault conviction under section 654 because it was part of an indivisible course of criminal conduct that included the kidnapping. Lampe argues the evidence demonstrates he committed the kidnapping and assault for the same purpose to "conceal the crime scene and avoid immediate apprehension." We disagree.

Section 654 prohibits multiple punishments for multiple offenses committed by a *single act* or during an *indivisible course of conduct*. (*People v. Pinon* (2016) 6 Cal.App.5th 956, 967.) A course of conduct is said to be indivisible if the defendant harbored a single criminal objective the entire time. (*People v. Gaio* (2000) 81 Cal.App.4th 919, 935.) We review the trial judge's decision whether to stay a conviction

18

under section 654 for substantial evidence. (*People v. Hutchins* (2001) 90 Cal.App.4th 1308, 1312.)

"'"The question of whether the acts of which defendant has been convicted constitute an indivisible course of conduct is primarily a factual determination, made by the trial court on the basis of its findings concerning the defendant's intent and objective in committing the acts. This determination will not be reversed on appeal unless unsupported by the evidence presented at trial.'" (*People v. Nichols* (1994) 29 Cal.App.4th 1651, 1657 (*Nichols*).)

Here, the record contains substantial evidence that Lampe committed the kidnapping and assault for different purposes. Starting with the kidnapping, Sarah testified that while Gilroy repeatedly urged Lampe to kill her, Lampe had assured her that she wasn't the original target and he wouldn't kill her if things went according to plan. This evidence reasonably supports an inference that Lampe held Sarah captive to prevent her from leaving and thus buy him time to dispose of the body. Regarding the assault, Sarah said he'd hit her across the face with a gun while they were getting high together because he thought he caught her looking around the garage. That testimony reasonably supports an inference that Lampe committed the assault to prevent Sarah from learning details she could later use to incriminate him.

When Lampe struck Sarah he was no longer in danger of immediate apprehension because Sarah was his captive. Section 654 "cannot, and should not, be stretched to cover gratuitous violence or other criminal acts far beyond those reasonably necessary to

19

accomplish the original offense." (*People v. Vasquez* (2020) 44 Cal.App.5th 732, 737; see also *People v. Nguyen* (1988) 204 Cal.App.3d 181, 189-193 [harming of unresisting robbery victim is driven by a different objective than the one behind the robbery itself].) But even if we give Lampe the benefit of the doubt and assume he committed both crimes for the purpose of avoiding immediate apprehension, section 654 would still not apply to his convictions.

Even where a course of conduct is "directed to one objective," multiple punishments are justified if the acts comprising the course of conduct are "divisible in time." (*People v. Beamon* (1973) 8 Cal.3d 625, 639 & fn. 11.) This is because a defendant has an "opportunity to reflect and to renew [their] intent before committing the next [offense]" when their actions are "'temporally separated.'" (*People v. Deegan* (2016) 247 Cal.App.4th 532, 542.) The record supports the conclusion Lampe had ample opportunity for reflection between kidnapping Sarah and assaulting her hours later. (See *People v. Lopez* (2011) 198 Cal.App.4th 698, 718 [the amount of time required between acts is simply enough to allow the defendant to "reflect upon what he had already done . . . and what he was about to do"].)

The judge correctly imposed punishment on the assault conviction.[4]

---

[4] Lampe also raises a claim of cumulative error, but we reject the claim because he has not demonstrated the judge committed a series of errors, that "though independently harmless, . . . rise by accretion to the level of reversible and prejudicial error.'" (*People v. Abilez* (2007) 41 Cal.4th 472, 523.)

D.    *Senate Bill No. 567*

Lampe argues a recent change to the sentencing law governing upper term sentences applies to his nonfinal sentence and necessitates remand for resentencing on his kidnapping conviction. The People agree with Lampe on both points, and so do we.

At the time the judge imposed Lampe's sentence, he had broad discretion to determine whether to select the lower, middle, or upper term for the kidnapping conviction. (Former § 1170, subd. (b) [authorizing the sentencing judge to select the term that "best serve[d] the interests of justice"].) As noted, the judge selected the upper term of 8 years. In doing so, and as was permitted under the law at the time, he did not state any aggravating factors affecting his decision. The judge did, however, make the following comment to Lampe before sentencing him, "You're certainly an enigma to the Court. On the one hand you committed this heinous crime against Mr. Wimberley for, at least in this Court's mind, for no apparent reason. You killed him in cold blood. But then on the other hand, you went out of your way to make sure that the second victim, that she didn't, that she wasn't murdered. You assured her she wasn't going to be killed and you went out of your way to assure she would survive, presumably knowing leaving her alive would lead to your arrest and that you would be punished for this crime. [¶] . . . [T]he Court believes that you have some consci[ence] and . . . wishes that you had exercised that humanity and consci[ence] before you killed Keith Wimberley."

While this appeal was pending, the Governor signed Senate Bill No. 567 (2021-2022 Reg. Sess.) (Stats. 2021, ch. 731), which "made significant changes to" section

21

1170 and became effective on January 1, 2022. (*People v. Lopez* (2022) 78 Cal.App.5th 459, 464 (*Lopez*).) As relevant here, the new law amended section 1170, subdivision (b) to "make the middle term the presumptive sentence for a term of imprisonment; a court now must impose the middle term for any offense that provides for a sentencing triad unless 'there are circumstances in aggravation of the crime that justify the imposition of a term of imprisonment exceeding the middle term, and the facts underlying those circumstances have been stipulated to by the defendant, or have been found true beyond a reasonable doubt at trial by the jury or by the judge in a court trial.'" (*Lopez*, at p. 464, quoting § 1170, subds. (b)(1) & (2).) Because this change "ameliorate[s] the possible punishment for a class of persons" it applies retroactively to all cases not yet final as of January 1, 2022, like Lampe's. (*People v. Superior Court (Lara)* (2018) 4 Cal.5th 299, 308; see also *Lopez*, at p. 465.)

Here, the judge did not specify any aggravating factors supporting the imposition of an upper term, let alone one the jury found beyond a reasonable doubt or the parties had stipulated to. And as we've seen, the judge found Lampe had exhibited a conscience in sparing Sarah despite knowing the risk of apprehension she posed. As a result, we conclude the upper term sentence on the kidnapping conviction is no longer authorized under current law and remand for resentencing.

On remand, the People "may elect to proceed under the requirements of the newly-amended version of section 1170, subdivision (b)," which would permit them to prove the existence of aggravating factors beyond a reasonable doubt to a jury (unless Lampe

22

waives the right to a jury and agrees to have the factors decided by the court beyond a reasonable doubt). (*Lopez*, *supra*, 78 Cal.App.5th at p. 468.) Alternatively, the People may "accept resentencing on the record as it stands." (*Ibid.*)

E.      *Assembly Bill No. 1869*

At sentencing, the trial judge ordered Lampe to pay $750 in attorney fees and a probation report fee of $727, under Penal Code sections 987.8, subd. (b) and 1203.1b, respectively. While this appeal was pending, Assembly Bill No. 1869 (2019-2020 Reg. Sess.) went into effect and repealed trial court's authority to impose and collect various fees designed to recover the cost of administering the criminal justice system, including the two imposed here. (Stats. 2020, ch. 92, § 62.) Lampe argues, and we agree, that those two fees are therefore no longer valid and should be stricken.

F.      *Gilroy's Murder Conviction*

Senate Bill No. 1437 (2017-2018 Reg. Sess.) also became effective while this appeal was pending. Among other things, the law amended the felony murder rule in section 189 to require that, in circumstances where the defendant was not the actual killer or did not intend to kill, the prosecution must prove they were a "major participant" in the underlying felony who acted with "reckless indifference to human life." (§ 189, subd. (e).)

Gilroy argues we must reverse her murder conviction because the felony murder instructions at her trial omitted these newly added elements. The People rightly concede the changes to the felony-murder rule apply retroactively to Gilroy's nonfinal murder

23

conviction but argue reversal is unwarranted because the omission was harmless beyond a reasonable doubt. We agree with the People.

### 1. *Relevant background and applicable law*

The prosecution argued Gilroy was guilty of first degree murder either as an accomplice to premeditated murder or as a participant in the underlying felony of robbery under the felony-murder rule. The felony-murder instruction given here, which was correct at the time, provided that Gilroy was guilty of first degree felony murder if the prosecution proved beyond a reasonable doubt that she was engaged in the commission or attempted commission of a qualifying felony (here, robbery) when Wimberley was killed. Under the new felony-murder rule, however, participation in a qualifying felony in which a death occurs is no longer sufficient to justify liability for first degree murder.

Section 189 states: "A participant in the perpetration or attempted perpetration of [qualifying felonies] in which a death occurs is liable for murder only if one of the following is proven: [¶] (1) The person was the actual killer. [¶] (2) The person was not the actual killer, but, with the intent to kill, aided, abetted, counseled, commanded, induced, solicited, requested, or assisted the actual killer in the commission of murder in the first degree. [¶] (3) The person was a major participant in the underlying felony and acted with reckless indifference to human life, as described in subdivision (d) of Section 190.2." (§ 189, subd. (e).)

A major participant in a robbery is someone whose "personal involvement" is "substantial" and "greater than the actions of an ordinary aider and abettor" (*People v.*

24

*Banks* (2015) 61 Cal.4th 788, 802 (*Banks*)), but they "need not be the ringleader" (*People v. Williams* (2015) 61 Cal.4th 1244, 1281). The factors for evaluating the degree of a defendant's participation include: (1) their role in planning the robbery; (2) their role in "supplying or using lethal weapons"; (3) their awareness of the "particular dangers posed by the nature of the crime, weapons used, or past experience or conduct of the other participants"; (4) their presence "at the scene of the killing" and thus whether they were "in a position to facilitate or prevent the actual murder"; (5) whether their "own actions or inaction play[ed] a particular role in the death"; and (6) their actions after the use of lethal force. (*Banks*, at p. 803.) "No one of these considerations is necessary, nor is any one of them necessarily sufficient." (*Ibid.*)

A person acts with reckless indifference to human life when they "'knowingly engag[e] in criminal activities known to carry a *grave risk* of death.'" (*People v. Clark* (2016) 63 Cal.4th 522, 616 (*Clark*).) Participating in an armed robbery, on its own, is insufficient to show a reckless indifference to human life. (*In re Scoggins* (2020) 9 Cal.5th 667, 678.) The factors for evaluating whether a defendant meets this standard include: (1) their awareness that a lethal weapon would be used, whether the defendant personally used a lethal weapon, and the number of lethal weapons used; (2) their "[p]roximity to the murder and the events leading up to it"; (3) the length of time they or their confederates restrained the victim; (4) their knowledge of a confederate's likelihood of killing; and (5) whether they made an effort to minimize the risk of violence. (*Clark*, at pp. 618-622.)

25

No single one of the *Banks* or *Clark* factors is necessary, nor is any one necessarily sufficient. (*Banks*, *supra*, 61 Cal.4th at p. 803; *Clark*, *supra*, 63 Cal.4th at p. 618.)

    2.      *The jury instruction was harmless*

The parties agree the felony-murder jury instruction left out the essential elements of major participation in the robbery and reckless indifference to human life. The parties also agree, correctly, that the harmless beyond a reasonable doubt standard articulated in *Chapman v. California* (1967) 386 U.S. 18 applies to the omission. (See *Neder v. United States* (1999) 527 U.S. 1, 4 (*Neder*) [so long as an instruction does not omit substantially all of the elements of an offense, the omission of elements is not reversible per se but is subject to the *Chapman* standard for assessing prejudice]; accord, *People v. Merritt* (2017) 2 Cal.5th 819, 826 (*Merritt*).) The dispute concerns the outcome of the prejudice analysis.

Our task when applying the *Chapman* standard under these circumstances "is to determine 'whether the record contains evidence that could rationally lead to a contrary finding with respect to the omitted element[s].'" (*People v. Mil* (2012) 53 Cal.4th 400, 417.) As our high court explained in *People v. Gonzalez* (2012) 54 Cal.4th 643, "a demonstration of harmless error does not require proof that a particular jury '*actually* rested its verdict on the proper ground, but rather on proof beyond a reasonable doubt that a *rational jury* would have found the defendant guilty absent the error.'" (*Id.* at p. 666, quoting *Neder*, *supra*, 527 U.S. at pp. 17-18 [cleaned up].)

26

As relevant here, courts have concluded that a rational jury would have found the defendant guilty absent the error in cases where the record contains "overwhelming evidence support[ing] the omitted element." (*Merritt*, *supra*, 2 Cal.5th at p. 828.) In this context, review for overwhelming evidence is essentially the inverse of a review for substantial evidence to support a conviction. Under a substantial evidence review, we view the evidence in the light most favorable to the judgment and presume in support of the judgment the existence of any facts the jury might reasonably infer from the evidence, whereas here we view the evidence in the light most favorable to the defense to determine "whether any rational fact finder could have come to the *opposite* conclusion." (*People v. Mil*, *supra*, 53 Cal.4th at p. 418.)

On this record, we conclude the omission of the major participant and reckless indifference elements was harmless beyond a reasonable doubt. This is because there was overwhelming evidence not only that Gilroy was a major participant who acted with reckless indifference in robbing Wimberley but also that she aided and abetted Wimberley's premeditated murder. The record demonstrates that although Gilroy had originally intended to commit an armed robbery, she changed her plans to murder when she learned she'd have an opportunity to punish her ex-boyfriend for the things he'd done to her. The evidence shows she called Wimberley and lured him to Lampe's house, led him inside the garage where Lampe was waiting to kill him, then stabbed him in the chest when he tried to run away and pushed him towards Lampe for the final blow. In other

words, Gilroy didn't just participate in an armed robbery, she planned and executed Wimberley's murder.

Gilroy argues that Lampe's testimony about the incident was sufficient to allow a rational juror to reach the opposite conclusion. It's true that in Lampe's version of events Gilroy wasn't a major participant in a qualifying felony who acted with reckless indifference to human life. According to Lampe, there had been no plan to rob anyone. Wimberley had shown up in his garage and he had acted in self-defense. In fact, Lampe wasn't even sure Gilroy was in the garage when he accidentally shot Wimberley; he thought she was in the bathroom. The problem with this argument, however, is that the record establishes beyond a reasonable doubt that the jury disbelieved Lampe's testimony. The jury was instructed on both premeditated and felony murder as well as killing in self-defense. By finding both Lampe and Gilroy guilty of first degree murder, they rejected Lampe's version of events and found that either there was a robbery in which Wimberley was killed or defendants killed him as part of a deliberate design. Given the overwhelming evidence in support of the latter theory, we conclude the felony-murder instruction was harmless beyond a reasonable doubt.

G.    *Corroboration of Accomplice Testimony*

Gilroy challenges the sufficiency of the evidence to support her convictions on the ground Mora's testimony wasn't sufficiently corroborated under section 1111. We conclude the record contains ample corroboration.

28

Under section 1111, a conviction cannot be based on "the testimony of an accomplice unless" the testimony is "corroborated by such other evidence as shall tend to connect the defendant with the commission of the offense." As our Supreme Court has explained, the corroborating evidence need only "*connect* the defendant with the crime charged." (*People v. Bunyard* (1988) 45 Cal.3d 1189, 1206, italics added.) It "need not corroborate the accomplice as to every fact to which he testifies" and it need not "be sufficient in itself to establish every element of the offense charged." (*Ibid.*) The evidence must simply "connect the defendant with the commission of the offense in such a way as reasonably may satisfy a jury that the accomplice is telling the truth." (*Ibid.*) In other words, it need only "substantiate[] enough of the accomplice's testimony to establish his credibility." (*People v. Knight* (1980) 111 Cal.App.3d 201, 206.) "'[T]he corroborative evidence may be slight and entitled to little consideration when standing alone.'" (*Bunyard*, at p. 1206.)

"The weight to be given to corroborative evidence is for the [fact finder], whose verdict will not be disturbed [on appeal] unless it is clear that on no hypothesis can it stand." (*People v. Blackwell* (1967) 257 Cal.App.2d 313, 318.) "If the record discloses evidence apart from that of the accomplice which connects the accused with the crime, an appellate court will inquire no further in determining the sufficiency of the corroborative evidence." (*Ibid.*) Section 1111 is an exception to the substantial evidence rule that the testimony of one witness may be sufficient to support a conviction. (*People v. Romero and Self* (2015) 62 Cal.4th 1, 32.) And, just as with the substantial evidence rule, we will

29

not assess the weight of the corroborating evidence or consider matters of credibility as those are the province of the fact finder. (*People v. Jones* (2018) 26 Cal.App.5th 420, 439.)

Here, Mora's testimony about Gilroy's statements to him shortly after the murder was not the only evidence connecting Gilroy to the crimes. Though not required by section 1111, many of the specific details of Mora's testimony were corroborated by other evidence at trial. Mora said Gilroy told him she'd stabbed Wimberley when he tried to run away, and Wimberley's body was discovered with a knife wound in the chest. Mora said Gilroy took from her purse and showed him two rings she'd taken from Wimberley after they'd killed him, and police found two rings in her purse. Mora said Gilroy told him that Wimberley had refused to return her laptop, and Sarah said Gilroy searched Wimberley's truck for a laptop when they reached Mora's place.

This detail-corroborating evidence would be sufficient on its own to allow the jury to consider Mora a credible witness, but there was also strong evidence connecting Gilroy to the crimes. Text messages she sent to Lampe hours before the murder show she was planning an armed robbery of their drug dealer, Junior. But most importantly, Sarah identified Gilroy as the woman who helped Lampe kill Wimberley and kidnap her.

The record contains more than sufficient evidence to corroborate Mora's testimony under section 1111.

H.    *Section 654 and Gilroy's Kidnapping and Dissuading Convictions*

As Lampe does with his kidnapping and assault convictions, Gilroy argues section 654 applies to her kidnapping and dissuading convictions because they were part of an indivisible course of conduct with the single objective of "keep[ing Sarah] quiet about the murder." We disagree and instead conclude the record contains substantial evidence that Gilroy committed the offenses for different purposes.

Starting with the kidnapping, Mora and Sarah both testified that Gilroy wanted to kill Sarah and was angry with Lampe for not sharing her objective. This evidence reasonably supports an inference that whereas Lampe kidnapped Sarah to stop her from getting away, Gilroy committed the crime with the intention of killing her. In contrast, when Gilroy pointed a gun at Sarah and threatened to kill her kids if she talked to anyone, her objective was not to kill Sarah but to frighten her into keeping her mouth shut. In other words, the dissuading offense served as insurance for Gilroy. If Sarah did survive, Gilroy wanted to make sure she wouldn't talk.

Because the record contains substantial evidence of two distinct objectives, the single-objective cases Gilroy attempts to draw comparisons to are readily distinguishable. (See *People v. Han* (2000) 78 Cal.App.4th 797, 809 [where defendants tied victims up before ransacking their home and stealing from them, the court accepted the People's concession that the single objective behind the false imprisonment and burglary offenses was to effectuate the burglary]; *People v. Bradley* (2003) 111 Cal.App.4th 765, 769 [because the defendant was convicted of attempted murder as a "'natural and probable'

31

consequence of the single objective she did entertain—the robbery of the victim," the court concluded § 654 applied to the offenses]; *People v. Latimer* (1993) 5 Cal.4th 1203, 1216 [§ 654 applied because the record contained no evidence the defendant drove the woman to a remote location for any other purpose besides raping her]; *People v. Martinez* (1980) 109 Cal.App.3d 851, 858 [§ 654 applied to rape and false imprisonment offenses where defendant held the victim "for a few moments" after the rape and tried to convince her not to tell anyone].)

Instead, we find this case more like *Nichols*, where the defendant hijacked the victim's tractor trailer, held him hostage for two hours, then let him go after looking at his driver's license and threatening to come to his house and kill him if he talked. (*Nichols*, *supra*, 29 Cal.App.4th at p. 1654.) The defendant was convicted of robbery, kidnapping for robbery, and attempting to dissuade a witness, and on appeal he argued section 654 applied to his kidnapping and dissuasion convictions because he'd committed them for the sole objective of stealing the victim's vehicle. The court concluded the record contained substantial evidence that defendant kidnapped the victim for the purpose of stealing his vehicle but dissuaded the victim for the purpose of avoiding detection. (*Nichols*, at p. 1657.)

"[T]he purpose of section 654 is to ensure that a defendant's punishment will be commensurate with [their] culpability." (*People v. Correa* (2012) 54 Cal.4th 331, 341.) Here, as in *Nichols*, Gilroy's culpability is commensurate with having committed two separate offenses for two separate objectives.

# III

## DISPOSITION

We affirm the judgment as to Gilroy. As to Lampe, we strike the portion of the judgment imposing fees under former Penal Code sections 987 and 1203.1b. We also reverse the sentence on his kidnapping conviction and remand to the trial court for resentencing on that count consistent with this opinion. In all other respects, we affirm the judgment as to Lampe.

NOT TO BE PUBLISHED IN OFFICIAL REPORTS

SLOUGH
J.

We concur:

MILLER
Acting P. J.

MENETREZ
J.